532 F.2d 641
 1 Fed. R. Evid. Serv. 222
 UNITED STATES of America, Appellee,
v.
Isreal WILSON a/k/a Junior Wilson a/k/a Big Man, Appellant.
UNITED STATES of America, Appellee,
v.
Boyd Griffin GRAY a/k/a Punkin, Appellant.
UNITED STATES of America, Appellee,
v.
Brenda Ann BROWN a/k/a Brenda Paige, Appellant.
 Nos. 75-1731, 75-1736 and 75-1737.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 12, 1975.
Decided March 26, 1976.
Rehearing and Rehearing En Banc Denied April 20, 1976.
 
 Robert A. Hampe, St. Louis, Mo., for appellants; Robert A. Hampe and Robert E. Ahrens, St. Louis, Mo., on brief.
 Richard E. Coughlin, Asst. U. S. Atty., St. Louis, Mo., for appellee; Donald J. Stohr, U. S. Atty., and Richard E. Coughlin, Asst. U. S. Atty., St. Louis, Mo., on brief.
 Before LAY, BRIGHT and HENLEY, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 Defendants Boyd Gray (a/k/a Punkin), Isreal Wilson (a/k/a Big Man), and Brenda Brown appeal from their convictions for conspiracy to distribute heroin in violation of 21 U.S.C. § 846. The singular and difficult issue presented on appeal is whether the trial court erred in admitting two notebooks and their contents which a government witness read to the jury. We find no error and affirm the convictions.
 
 
 2
 The sufficiency of the evidence supporting the conspiracy conviction of each defendant is not challenged. However, a review of the facts is essential to the ruling on the controversial notebooks. The indictment recited nine overt acts involving drug sales and conversations with Drug Enforcement Agents and government informant Henderson McCoy (a/k/a Poor Boy). The overt acts alleged and proven were:
 
 
 3
 1. On November 1, 1974, unindicted co-conspirator Jerry Fleming, in a conversation with a Federal Narcotics Agent, agreed to contact Boyd Griffin Gray to arrange a purchase of two spoons of heroin by the Federal Narcotics Agent.
 
 
 4
 2. On November 1, 1974, Brenda Ann Brown had a conversation with an undercover Federal Narcotics Agent in which she agreed to contact Boyd Griffin Gray concerning the purchase of two spoons of heroin.
 
 
 5
 3. On November 1, 1974, Isreal Wilson had a conversation with an undercover Federal Narcotics Agent concerning the purchase of two spoons of heroin.
 
 
 6
 4. On November 1, 1974, Boyd Griffin Gray had a conversation with a confidential government informant concerning the purchase of two spoons of heroin.
 
 
 7
 5. On November 4, 1974, Jerry Fleming sold a quantity of heroin to an undercover Federal Narcotics Agent.
 
 
 8
 6. On November 5, 1974, Isreal Wilson had a conversation with an undercover Federal Narcotics Agent where he agreed to sell two spoons of heroin for $325.00.
 
 
 9
 7. On November 5, 1974, Jerry Fleming sold a quantity of heroin to an undercover Federal Narcotics Agent.
 
 
 10
 8. On November 7, 1974, Isreal Wilson had a conversation with an undercover Federal Narcotics Agent concerning the purchase of two spoons of heroin.
 
 
 11
 9. On November 7, 1974, Isreal Wilson had a conversation with Boyd Griffin Gray concerning the sale of heroin to the undercover Federal Narcotics Agent.
 
 
 12
 Henderson McCoy, the informant, testified that on various occasions he purchased heroin from each of the defendants and had sold heroin for them as well. McCoy described the defendants' operations, stating that he received heroin from each of the three defendants which he would sell at "a rate". He testified that the defendants ran their operation from various houses in St. Louis.[1] These houses were on Elliott and St. Louis, Evans and Sarah, and Grand and Herbert in the City of St. Louis. The money and heroin would be passed through a hole in the door and then, according to McCoy, the transactions were usually recorded in code in a book by either "Pauncho" (an unindicted co-conspirator) or Brenda. He stated heroin was sold either in "spoons" or in capsule form called "buttons". The "house" at Grand and Herbert was an apartment run by someone known to the informant as "Jimmy".
 
 
 13
 Detective Klier of the St. Louis Police Department went to the "house" at Grand and Herbert on April 30, 1975, on information that drugs were being sold there. Detective Klier found James Shelton in the apartment. The door had a two-inch hole in it and the apartment was practically vacant except for certain small items. Klier testified that he found numerous empty red capsules in one room and syringes and two notebooks in the bedroom.
 
 
 14
 Over defendants' objections, the government introduced the notebooks and their contents. The government urged in the trial court that although the notebooks were hearsay, they were admissible even though the author was unknown because they were: 1) declarations against interest; and 2) admissible under the co-conspirator rule.[2] The trial court overruled defendants' objections.
 
 
 15
 Detective Klier was allowed to read all the contents of the notebooks to the jury. The notations specifically identified "Brenda" and "Punkin" (Boyd Gray's nickname) as taking drugs and money. Defendant Wilson was not mentioned in the notebook.[3]
 
 
 16
 The defendants presented no evidence, relying on their motions for acquittal at the end of the government's evidence. The jury returned verdicts of guilty.
 
 
 17
 The defendants argue that no proper foundation has been laid for the notebooks, since the identity of the writer or writers was not shown. Defendants further urge that the co-conspirator rule is not applicable since there is no independent evidence that the declarant was part of the conspiracy.[4]
 
 
 18
 Initially, we find sufficient evidence to show prima facie authenticity or genuineness of the notebooks. Moreover, assuming, without deciding that there was not sufficient proof to invoke the co-conspirator rule, we find the notebooks were nonetheless admissible as circumstantial evidence, not as an exception to the hearsay rule, but because they were not hearsay at all.
 
 
 19
 Authentication.
 
 
 20
 The entries in the notebooks are hand printed by one or more persons. The government represents that it does not know the identity of the author.
 
 
 21
 Rule 901 of the Federal Rules of Evidence provides:
 
 
 22
 (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
 
 
 23
 (b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
 
 
 24
 (4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
 
 
 25
 Under this rule, the contents of a writing may be used to aid in determining the identity of the declarant. The primary concern in relying on the contents of an instrument to prove its authenticity is the danger of forgery or substitution of a fraudulent document. However, as has been authoritatively explained:
 
 
 26
 For this principle to operate the (writing) must deal with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding so that the contents of the (writing) were not a matter of common knowledge.
 
 
 27
 The evidential hypothesis in the authentication step is this: only those who knew the details in the (writing) could have written it; if the purported writer can be shown to have probably known the details and if no other person is likely to have known them when the (writing) was written, it is likely that he wrote it. The force of the inference decreases as the number of people who know the details and may have written the (writing) increases. Moreover, if there is a serious question of forgery, the inference is subject to being rebutted by the possibility that the details were added by someone to give an air of verity to the document rather than by the purported author who obtained the information in the usual way.
 
 
 28
 5 J. Weinstein & M. Berger, Weinstein's Evidence P 901(b)(4)(01), at 46.
 
 
 29
 It is well settled that genuineness of a writing can be established by circumstantial proof without resort to the handwriting or typewriting. Where the writings are such that only those persons acquainted with the particular transactions involved could have written them, the authenticity of the evidence is considered more reliable.
 
 
 30
 Under these principles, we find the contents of these notebooks refer to activities (in this case, drug trafficking) and are characterized by a code of which only someone connected with the transactions would have known. The writer uses nicknames of individuals and the code term "buttons" which the informant had testified were heroin capsules. The writer was obviously familiar with the procedures used by the defendants in their drug operations. Although the precise identity of the declarant is unknown, we think there was at least a prima facie showing that the declarant was a member of the drug conspiracy charged in the indictment.
 
 
 31
 Moreover, there is other evidence which corroborates the authenticity of the notebooks. The books were found in an apartment which the informant said both "Punkin" and Brenda frequented, and in which drugs were sold. The apartment had an unusual hole in its door fitting the informant's description and a known co-conspirator was found there at the time of the raid. The informant further testified that the defendants' drug transactions were recorded in notebooks. This evidence in our view provides a prima facie showing of authenticity of the notebooks. This showing could have been, but was not, countered by any evidence from defendants that the documents were forged or otherwise not what the government claimed.
 
 
 32
 Hearsay.
 
 
 33
 Notwithstanding the showing of relevance and authenticity the notebooks must still be excluded if they are hearsay. We find that the notebooks were not hearsay since they were not offered to prove the truth of the facts asserted therein. Instead, they were admissible as circumstantial evidence (a) to show the character and use of the place where the notebooks were found and (b) to corroborate the informant's testimony. See generally, 6 J. Wigmore, Evidence § 1766, at 180 (3d ed. 1940).
 
 The basic definition of hearsay is:
 
 34
 . . . a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
 
 
 35
 Fed.R.Evid. 801(c).
 
 
 36
 In the present case, the assertions in the notebooks were not material to any of the overt acts supporting the conspiracy. The overt acts were independently established. Whether Brenda or Punkin delivered, bought or sold a specified amount of "buttons" on any specific date was not part of the government's burden of proof. Thus, the truth of these statements in the notebook was not at issue in the case. The evidence, however, did tend to show that the apartment was being used for drug trafficking.
 
 
 37
 Thus, we view the declarations in the notebooks as utterances, used circumstantially, giving rise to the indirect inference that the apartment was the scene of drug sales and drug related activity.[5] See 6 J. Wigmore, Evidence § 1766 (3d ed. 1940); McCormick's Handbook of the Law of Evidence § 249, at 589 (E. Cleary, ed. 1972). See also United States v. Pasha, 332 F.2d 193, 196-97 (7th Cir.), cert. denied, 379 U.S. 839, 85 S.Ct. 75, 13 L.Ed.2d 45 (1964); Armstrong v. United States, 327 F.2d 189, 197 (9th Cir. 1964); Reynolds v. United States, 225 F.2d 123, 131-32 (5th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 197, 100 L.Ed. 801 (1955).
 
 
 38
 Furthermore, as the government contended at trial,[6] the books, the entries made and the codes used were as described previously by the informant. Therefore, the existence of the notebooks and the fact of these entries served to corroborate his testimony as to the manner in which the defendants carried on their business. It is the fact that the statements were written, and not the truth of the statements, which was relevant.[7]
 
 
 39
 We anticipate the contention that the government may have misused the statements in closing argument under the co-conspirator rule as evidencing truth of the statements in the notebooks.[8] However, the government's argument must be taken as a whole, and it is significant that the United States Attorney later told the jury in his closing statement:
 
 
 40
 The question is not whether they sold any to Federal officers or even if they sold any to anybody else, the question is was there an agreement that they would (have) if (they) had the opportunity to sell narcotics and was one overt act made at least one overt act made in the furtherance of that conspiracy.
 
 
 41
 Transcript at 246.
 
 
 42
 A final consideration is whether the evidence should have been excluded as too prejudicial even if otherwise admissible. In our view, the fact that Brenda and Punkin are mentioned in the book as making sales is merely cumulative to other direct proof by McCoy as to their dealing in drugs on other specific occasions. The fundamental issue was the existence of a conspiracy vel non. This issue was properly argued by the government and instructed upon by the trial court. The notebooks were sufficiently authenticated. We hold their evidential value outweighed any prejudice to the defendants.
 
 
 43
 Judgments are affirmed.
 
 
 
 [1]
 McCoy described in detail how a "house" was operated:
 Q Now, in the actual running of a house what would be the jobs of the individuals that were running the house?
 A Well, the first thing the job is you got to have a protection in a house so somebody would have to have something there to protect what you got in that house because let's face it, people, you know, stick you up, highjack you, take your stuff. So once you get your protection set up in the house then it's a simple matter of dealing once people know where you're dealing from and if the stuff is there such where, you know, where when junkies will buy. Well, then it's easy to run a house. You just go to the house; they know you; you stick your money through the hole; they stick the stuff back out; and that's that.
 Q Did you ever open the door or was that a normal procedure?
 A Well, it's not a normal procedure unless you know a person real good, exceptionally good.
 Q But normally it would be set through a hole, is that correct?
 A Right.
 Q How big would the hole be?
 A Just a small hole big enough to put a spoon through.
 Q What would be the purpose of putting a spoon through?
 A Well, you see, you stick your money through the hole and if you're getting say let's say you're getting two or three things; well, you can put that on a spoon and and stick it right back through the hole.
 Q And that way the door would never have to be opened?
 A No, it wouldn't have to be opened.
 Q Did you ever run any of these houses?
 A Well, no I wouldn't say run a house but I have been up in one of the houses.
 Transcript at 96-97.
 
 
 [2]
 Evidence admissible under the co-conspirator rule of the Federal Rules of Evidence is no longer considered hearsay. See Fed.R.Evid. 801(d)(2)(E)
 
 
 [3]
 Government Exhibit No. 3 contained the following entries:
 On page one:
 4-26-75
 $112.00 cash and 21 in the bottle 24, and 60 in the plastic bags. So you started with 105, buttons.
 S/ J.R.
 On page two:
 Left Nut
 I started with 78 buttons He brought 80, but gave me two for myself. Brenda picked up $133 Dollars for 19 buttons Brenda picked up $210 Dollars for 30 buttons, She has picked up the last $203 Dollars for 29 buttons. All total she has picked up $546 Dollars for 78 buttons.
 Brenda brought 74 buttons, gave Lesa two and Punkin 4 that 6 buttons counted for. All total Punkin took 8 buttons.
 I'm leaving 54 buttons, and $84 Dollars. 12 buttons.
 On page three:
 $290
 $ 60
 Left
 I'm starting with 105 buttons. Brenda picked up $210 for 30 buttons
 Punkin came and got 3 buttons and $30 Dollars tonight. Brenda picked up $175 Dollars for 25 buttons.
 On page four:
 Tue, 29, 75
 We started with 131 buttons Brenda picked up $301 Dollars for 43 buttons
 On page five some addition appeared. The remainder of the pages were blank.
 On the inside cover of the notebook numerous numbers and computations appear.
 Government Exhibit No. 4 contained the following notations:
 On the first page:
 Sat. 26-75
 
 
 [105]
 buttons, is what I'm starting with
 
 
 [105]
 
 x 7
 $735.00 the total bill for 105 buttons I gave Brenda $210 Dollars for 30 buttons Punkin took $30 Dollars and 3 buttons
 The second page reads:
 Brenda picked up $175 Dollars for 25 buttons, all total she has picked up $385 Dollars for 55 buttons.
 That makes the bill comes to $675 Dollars since Punkin got $60.
 On page three:
 
 
 [51]
 buttons
 
 
 [80]
 buttons
 
 
 [131]
 
 On page four:
 Tue, 29, 75
 
 
 [131]
 buttons Brenda picked up $301 Dollars for 43 buttons
 
 
 [4]
 Before any statement of a co-conspirator is admissible under the co-conspirator rule, Fed.R.Evid. 801(d)(2)(E), proof is also required that the statements were made at the time of the conspiracy and in furtherance of it. Cf. United States v. Smith, 520 F.2d 1245, 1247 (8th Cir. 1975). The defendants concede that these factors are present, but urge that only through an independent showing of the declarant's identity can it be shown the declarant was a member of the conspiracy
 
 
 [5]
 In State v. Tolisano, 136 Conn. 210, 70 A.2d 118 (1949), the Connecticut Supreme Court upheld the admission of telephone calls received during a search of an apartment suspected as the headquarters for illegal gambling. The court stated that
 (T)he telephone calls are admissible as evidence that bets were being placed but not that the statements made to the officers were true. The evidence is admitted, not as exception to the hearsay rule, but because it is not within the rule.
 
 
 [70]
 A.2d at 120
 See also State v. White, 107 R.I. 306, 267 A.2d 414 (1970).
 
 
 [6]
 The government argued:
 Of course, we don't have any knowledge about books until all of a sudden a cop tells us hey, we found books like that at the house on Herbert, and it meshes. The statements are completely separate. McCoy says they had books and sure enough the books are found. Now, ladies and gentlemen, if that's not corroboration, what is.
 Transcript at 251-52.
 
 
 [7]
 Some authorities refer to this as "non assertive conduct" and therefore outside of the hearsay rule. See 4 J. Weinstein & M. Berger, Weinstein's Evidence, P 801(c)(01), at 62
 
 
 [8]
 In closing summation the government attorney argued:
 They find these two notebooks. These two notebooks which demonstrate beyond any possible doubt the activities of Boyd Griffin Gray and Brenda Brown. Isreal Wilson's name is not in these by the way. There's not one reference to him. But that doesn't mean he wasn't involved, too. But this is proof positive, ladies and gentlemen, when they are talking about 71 buttons; they have a 7 underneath that; and they multiply it out you know what buttons are and you know what the 7 meant. It would have meant $7. The guy that was running that house for them didn't even get as good a deal as Henderson McCoy was getting. He was dealing on a $6 base. But, ladies and gentlemen, you heard that officer testify as to what is in those books. Punkin came and got 3 buttons. Punkin came and gave us 60 buttons. Brenda got 105. They talk about starting with 105. Another guy says you start with 105. All on the same day, ladies and gentlemen.
 I submit to you that the evidence in this case is clear. The question is whether or not these individuals engaged in the conspiracy and I submit to you the evidence shows that.
 Transcript at 234-35.