UNITED STATES of America, Appellee,

v.

Leo Anthony BROWN, Appellant.

UNITED STATES of America, Appellee,

v.

Cleo Arthur BROWN, Appellant.

UNITED STATES of America, Appellee,

v.

Miriam Marie DeROODE, Appellant.

UNITED STATES of America, Appellee,

v.

Brenda BASSIGNANI, Appellant.

Nos. 78–1099, 78–1104, 78–1114 and 78–1119.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1978.

Decided Sept. 14, 1978.

Rehearings Denied Oct. 17, 1978.

Peter J. Thompson (on brief), Delaney, Thompson & O'Rourke, Ltd., Minneapolis, Minn., and Joseph T. Dixon, Jr. (on brief), Henson & Efron, Minneapolis, Minn., argued, for appellants; was filed by Bruce P. Candlin, Minneapolis, Minn., and Fred A. Reiter, Minneapolis, Minn., on brief.

Andrew W. Danielson, U. S. Atty., and Ann D. Montgomery, Asst. U. S. Atty. (argued), Minneapolis, Minn., on brief for appellee.

Before LAY, HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Appellants in this case were charged in a heroin conspiracy and distribution scheme which took place in Minneapolis and extended over a period of about five months. Appellants include two women, Brenda Bassignani and Miriam De Roode, and twin brothers, Leo Anthony Brown and Cleo Arthur Brown. Also indicted in the scheme were Laura Figone and Michael Rush. Neither of the latter two is an appellant, however; Laura Figone pleaded guilty after the trial began, and Michael Rush is a fugitive from justice, having failed to show up at the trial.

Minneapolis police and federal authorities jointly undertook the investigation of the criminal activity involved in this case. Central to the police efforts was the undercover work of Minneapolis Police Officer Susan Belkair. Through her, the government made at least six heroin buys, at first facilitated through Michael Rush from Laura Figone, and later from Laura Figone directly. The evidence, considered in the light most favorable to the government, established that Leo Brown was Figone's source.

The appellants, together with Michael Rush and Laura Figone, were charged in a multicount indictment. Appellants were charged as follows: Count II: Rush, Figone and Leo Brown charged with distribution of one-half ounce of heroin on April 1, 1977; Count IV: Figone, Leo Brown, Bassignani and DeRoode charged with distribution of ⅛ ounce of heroin on September 9, 1977; Count V: Figone, Leo Brown, Bassignani and DeRoode charged with distribution of ½ ounce of heroin on September 10, 1977; Count VI: Figone, Leo Brown, Bassignani and DeRoode charged with distribution of ¼ ounce of heroin on September 12, 1977; Count VII: DeRoode and Leo Brown charged with possession with intent to distribute ⅛ ounce of heroin on September 12, 1977; Count VIII: Bassignani and Leo

Brown charged with possession of .25 grams of heroin on September 12, 1977; Count IX: Cleo Brown charged with possession of .50 grams of heroin on September 13, 1977; Count X: Rush, Figone, Leo Brown, Bassignani, Cleo Brown and DeRoode all charged with conspiracy to distribute heroin from March 24, 1977, "to the present." (The indictment was filed on November 11, 1977.)

The Count IX possession charge against Cleo Brown was dismissed by the government during the trial. With the exception of the Count IV charge against Bassignani, on which charge she was acquitted, the defendants were found guilty on all counts as charged in the indictment.[1] Only one appellant, Cleo Brown, challenges the sufficiency of the evidence upon which he was convicted.

The appellants jointly raise several issues: the sufficiency of the affidavits used to support searches of their residences, plus the adequacy of the warrants under Fed.R. Crim.P. 41; the adequacy of the instructions to the jury on the law of conspiracy; and finally an alleged infringement of their fifth amendment privilege against self-incrimination. We have studied these issues, and conclude that the convictions against all of the appellants except Cleo Brown should be affirmed; the conviction of Cleo Brown is reversed.

The various residences of the appellants are important to this case. Miriam DeRoode resided at the apartment building at 2509 Dupont Avenue South, Leo Brown and Brenda Bassignani lived at 2753 Colfax Avenue South, and Cleo Brown lived at 7333 Gallagher Drive. Laura Figone first lived at 3030 Pleasant Avenue, and later moved to 2610 Garfield Avenue South.

*Search and Seizure.*

In the investigation and prosecution of this case, four search warrants were requested, issued and executed. Three warrants were issued to search three different residences; one was issued to examine the contents of a safe deposit box. The appellants concede the sufficiency of the warrant for the first search at the 2509 Dupont Avenue South residence, where the arrests of all the appellants were made, and where Laura Figone was observed prior to each delivery of heroin, including the delivery on the night of the arrest, September 12, 1977.

The third and fourth searches, the search of the Gallagher residence and the safe deposit box, occurred subsequent to the Dupont and Colfax searches. The fruits of these latter searches were not offered into evidence by the government, and we do not consider it necessary to examine the sufficiency of the affidavits offered in their support. As evidence was not introduced as a result of these searches, "there is nothing upon which the exclusionary rule can operate." *United States v. Christenson*, 549 F.2d 53, 57 n.2 (8th Cir. 1977), *quoting from Hasty v. Crouse*, 308 F.Supp. 590, 594 (D.Kan.1968), *aff'd* 420 F.2d 1384 (10th Cir. 1970). *United States v. Larson*, 555 F.2d 673, 676 (8th Cir. 1977).[2]

The sharpest disagreement between the parties focuses on the second search at 2573 Colfax, the residence of appellants Leo

---

1. DeRoode and Bassignani were each sentenced to a one-year term, followed by a special parole term of three years. Leo Brown was sentenced to eight years, with a four-year special parole term. His brother Cleo Brown was sentenced to six years, with the identical four-year special parole term.

2. The appellants, however, raise one issue with respect to the Gallagher search. The government, as we have said, chose not to introduce evidence seized in the Gallagher search, although the court had denied the defendant's motion to suppress. Consequently, Cleo Brown's counsel briefly mentioned that "a very, very small amount of heroin, a half of a gram which is about equivalent to a sixtieth of an ounce" was found in Cleo Brown's apartment.

Counsel made this remark during his opening argument, on the first day of trial. Moreover, numerous references to heroin, and exhibits of heroin were introduced during the trial concerning the defendants' activities. The jury was appropriately cautioned that lawyer's remarks to them would not constitute evidence. Given these circumstances, we see no prejudicial impact on the other appellants.

Brown and Brenda Bassignani.[3] Appellants strongly contend that the affidavit upon which the warrant was issued was deficient, that probable cause was lacking, and that the affidavit established no link between the Brown-Bassignani residence and the items the police sought there. It is the contention of Leo Brown that the affidavit may suggest his guilt, but that it does not suggest that evidence was secreted at his residence.

■ As this court has previously done, "[w]e begin our analysis by noting that the search in this case was sanctioned by a state judge's issuance of a search warrant based upon a finding of probable cause." *United States v. Christenson, supra,* 549 F.2d at 55. Courts evince a strong preference for searches made pursuant to warrant, and, in some instances, may sustain them where warrantless searches based on a police officer's evaluation of probable cause might fail. *Id.*

Accordingly, the Supreme Court has cautioned that a reviewing court should employ common sense in the interpretation of affidavits for search warrants:

> [T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants * * * must be tested and interpreted by * * * courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

■ Deference is accorded an issuing magistrate's probable cause determination, *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), "and, in doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants, *United States v. Ventresca, supra,* 380 U.S. at 109, 85 S.Ct. 741," *United States v. Christenson, supra,* 549 F.2d at 56; *United States v. Mulligan,* 488 F.2d 732, 735–36 (9th Cir. 1973), *cert. denied,* 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974).

■ It is not required that the affidavit underlying the search allege *direct observation* of criminal activity in order to justify the issuance of a warrant permitting a search, *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970); the issuing magistrate may properly rely on normal inferences drawn from the surrounding circumstances and allegations of fact as well as the type of the crime. *Id.*

As the *Lucarz* court said in the context of a case involving stolen property:

> The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property. *United States v. Teller,* 412 F.2d 374 (7th Cir. 1969); *Aron v. United States,* 382 F.2d 965 (8th Cir. 1967); *Anderson v. United States,* 344 F.2d 792 (10th Cir. 1965); *Porter v. United States,* 335 F.2d 602 (9th Cir. 1964).

*United States v. Lucarz, supra,* 430 F.2d at 1055.

■ The face of the affidavit in this case reveals the following: that during the in-

---

3. Sought in the Colfax search, according to the affidavit, were "the proceeds of an earlier sale on September 10, 1977, and evidence of Leo Brown's heroin trafficking."

vestigation an undercover policewoman made at least six heroin purchases, three directly from Laura Figone and three indirectly; that an individual named "Leo" was Figone's "old man";[4] that Figone had a steady supply of heroin, and that the heroin was stored in two places.

From the facts alleged in the affidavit the probability of criminal complicity with respect to heroin transactions among the appellants could easily be inferred. The Browns, Bassignani, and DeRoode were arrested on September 12 at the Dupont residence, within an hour after Figone had made a sale to the agent; just prior to the delivery of the heroin on September 12, Figone had gone to Dupont to pick up the heroin, as she had been observed to do for other sales. When Figone arrived that night, a white woman accompanied her to the door marked "please keep closed for security reasons"; Figone left soon thereafter to make the sale. Two black males were later seen entering the marked door. The arrests of the Browns, DeRoode and Figone at Dupont followed. When Leo Brown was arrested, he had on his person $600 of the $660 the agent had given Figone for that night's sale. Heroin was found in DeRoode's bedroom pursuant to a search at Dupont. These facts sufficiently suggest the probability of heroin trafficking among those arrested, and strongly reinforce the inference that Leo Brown was Figone's source.

Other facts suggest that proceeds and heroin could be found at the Leo Brown residence. In the search of Leo Brown's residence, the police sought proceeds of the September 10 sale, as only the marked money from the sale on September 12, the night of the arrest, had been found on Brown; for the sale on the 10th, Figone had been given $1250.

On the evening of the 10th, after she stopped at Dupont,[5] Figone was then observed to drive to 2753 Colfax, the Leo Brown-Bassignani residence, talk to someone for a moment who came up to her car, and then drive back to her own residence to deliver the heroin to the undercover agent. Items taken from Leo Brown's and Brenda Bassignani's wallets the night of their arrest, as outlined in the affidavit, clearly point to 2753 Colfax as the place of their residence.

From the foregoing facts an illegal complicity to sell heroin may be inferred; it may be inferred that Leo Brown was Figone's source; that she had delivered the money to him following the September 12 sale; and that she may have gone to deliver the money to a coconspirator on September 10 when she stopped outside the Brown-Bassignani residence. From these facts, the fact that earlier proceeds were not found on Brown when he was arrested, and that heroin was said to have been kept in two places, it could be inferred that the September 10 proceeds and evidence of heroin trafficking might be found at the Brown-Bassignani residence.

We have said that "[t]he affidavit need only establish the *probability* of criminal activity and secreting of evidence on specific premises, not proof beyond a reasonable doubt." *United States v. Smith*, 462 F.2d 456, 460 (8th Cir. 1972). *See also United States v. Mulligan*, *supra*, 488 F.2d at 736.

The present affidavit clearly has more to recommend it than the conclusory statements purporting to establish probable cause in some cases disapproved by this court. *See, e. g., Patterson v. Lockhart*, 513 F.2d 579 (8th Cir. 1975) and *Gillespie v. United States*, 368 F.2d 1, 4–6 (8th Cir. 1966). While the present case is admittedly

---

4. At trial Susan Belkair testified to the meaning of Figone's "old man." She said in this situation it meant "someone that directs her, controls." The phrase, in the context of the affidavit, appeared as follows:

> Michael Rush confided with the undercover agent that his heroin source [Laura Figone] had a steady supply of heroin and that her old man's name was Leo and that she had

two different places where the heroin was stored.

5. The affidavit relates that on three previous occasions where Figone told the agent she would have to go to pick up heroin, surveillance officers observed her going to 2509 Dupont South.

close, we choose to resolve the doubt in favor of sustaining the search, and the judgment of the issuing authority.

█ Appellants also attack the search warrant on the basis of two alleged violations by the government investigators of Fed.R.Crim.P. 41. The government has conceded the federal nature of this search, *United States v. Sturgeon,* 501 F.2d 1270, 1273 (8th Cir.), *cert. denied,* 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974), and thus the applicability of the Rule.[6] Two Rule 41 violations are cited by the appellants: (1) the warrants were not requested by federal officers, 41(a) and (2) the warrant for the Dupont search was not directed to a federal officer, 41(c).

█ While the government's procedure in this case did not comport with the Rule, this does not necessarily require exclusion of the evidence in a federal prosecution. In *United States v. Burgard,* 551 F.2d 190, 193 (8th Cir. 1977), this court adopted the standard set forth in *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975). In *Burke* the Court of Appeals for the Second Circuit held that although a federal search warrant issued by a state court judge had been directed to a state officer, had not designated a federal magistrate for return, and had designated return only "within a reasonable time," ex-

clusion was not warranted "unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *United States v. Burke, supra,* 517 F.2d at 386–87 (footnotes omitted).

The *Burke* court applied this prejudicial error test even though it concluded that the three provisions which had been violated were " 'designed to protect the integrity of the federal courts or to govern the conduct of federal officers,' " *id.* at 385 (emphasis deleted), *quoting from United States v. Sellers,* 483 F.2d 37, 43 (5th Cir. 1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). This enunciated test for prejudice was applicable to violations of Rule 41 unless "the defect made what was done in effect an unconstitutional warrantless search, * * *." *United States v. Burke, supra,* 517 F.2d at 386.

The appellants have offered no indication that the search might not have occurred or would not have been so abrasive had the Rule been followed; a six months' investigation preceded the issuance of the warrants, and the affidavits on their face show a joint federal-state investigative effort.

---

**6.** Searches are to be characterized as federal if there is significant federal involvement in the search.

Rule 41 provides as follows:

(a) Authority to issue warrant. A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state court of record within the district wherein the property sought is located, upon request of a federal law enforcement officer or an attorney for the government.

   \*    \*    \*    \*    \*    \*

(c) Issuance and contents.

(1) Warrant upon affidavit. A warrant other than a warrant upon oral testimony under paragraph (2) of this subdivision shall issue only on an affidavit or affidavits sworn to before the federal magistrate or state judge and establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched. The finding of probable cause may be based upon hearsay evidence in whole or in part. Before ruling on a request for a warrant the federal magistrate or state judge may require the affiant to appear personally and may examine under oath the affiant and any witnesses he may produce, provided that such proceeding shall be taken down by a court reporter or recording equipment and made part of the affidavit. The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified. The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime. It shall designate a federal magistrate to whom it shall be returned.

There is no indication that the state judges who issued the warrants would not have authorized the search had federal officers requested the warrants, or had the warrants been directed to federal law enforcement officers [7] for execution.

Similarly, we find no evidence of an intentional or deliberate attempt on the part of federal investigators to contravene the provisions of the Rule. In this regard the government contends that only the first of the four warrants issued was erroneously directed to a state officer for execution rather than to a federal officer.

The crux of appellants' argument seems to be that the search might not have occurred if the requests had been submitted to a federal magistrate instead of a state judge: "the government successfully avoided the more rigorous scrutiny [of probable cause] its requests would have met with had a federal magistrate reviewed them." The answer to this, of course, is that a lack of probable cause may always be challenged, and that we have examined that challenge here and sustained the finding of probable cause.

*Conspiracy Instructions.*

Appellants contend that the trial court's instructions to the jury regarding the conspiracy count were deficient in three respects. Two alleged errors concern the omission of requested instructions: first, that guilt not be determined by mere association, and second, that membership in a conspiracy be proven by one's own words or acts. It is also contended that the trial court's summation on conspiracy was inadequate.

■ It is true that the trial judge did not give the instructions verbatim in the form requested by the defendants. However, the court is not obligated to do so. If a charge is substantially accurate, it is not error for the trial court to refuse the requested instruction. *United States v. Zarattini,* 552 F.2d 753, 759 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977). And it is well settled that in reviewing the adequacy of jury instructions, the charge to the jury must be viewed as a whole. *United States v. Kershman,* 555 F.2d 198, 201 (8th Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977).

■ In reviewing the instructions as a whole, it appears that the charges given by the trial court contained the substance of the instructions requested by the defendants. Regarding guilt by association, the appellants had requested the following charge:

[M]ere similarity of conduct between various persons, and the fact they may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

In an initial charge on principles of general applicability the trial judge here instructed: that separate consideration was to be given to each defendant and separate verdicts to be reached as to each defendant in the case; that the fact that the defendants were sitting together at trial or were *present together at the scene of the crime was not sufficient to establish the guilt of a particular defendant,* and, that the jury must find that each defendant was a knowing participant in some criminal act.[8]

The trial court later gave a careful explanation of the charge of conspiracy, that it

---

7. Contrary to appellants' apparent argument, the Rule allows state judges as well as federal magistrates to issue warrants thereunder.

8. The exact text of the court's instruction at this point read:

I also advise you that *mere presence at the scene of a crime and even knowledge that a crime has been committed or is being committed are not sufficient to establish guilt* unless you find beyond a reasonable doubt

that that particular defendant was a knowing participant in some criminal act.

I *suppose it's possible for a person to be at the scene of a crime, and at first blush you might associate him with it because you saw him there, but the evidence must show an active participation and knowledgable* [sic] *participation in order to establish guilt.* (Emphasis added.)

was an agreement to commit a crime, to violate a law, and, that the agreement must be accompanied by some overt act "which manifests [the] conspiracy which has been formed." In summation, the court then reiterated its charge that separate consideration be given the case against each of the defendants.

In our estimation the instructions which the trial court gave clearly conveyed both messages of the appellants' requested charge: that a defendant's guilt is not to be adjudged by his mere association with others, and that a discussion among persons of "common aims and interests" does not establish the existence of a criminal conspiracy.

■ Appellants' second requested charge would have instructed the jury that membership in a conspiracy is to be determined by one's own words or acts, and that a defendant cannot be bound by the words and acts of other conspirators until a conspiracy, and the defendant's membership in it, is established:

[I]n determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only his acts and statements. He cannot be bound by the acts or declarations of other participants until it is established that a conspiracy existed, and that he was one of its members.

We consider that a fair reading of the instructions as a whole imparts the same guidelines to the jury. The court first instructed on *membership* in a conspiracy:

Membership in a conspiracy. Proof of membership in a conspiracy requires a showing that *the alleged conspirator knowingly and willfully participated* in the unlawful plan with the intent to further some purpose of a conspiracy. *To participate knowingly and willfully means to participate voluntarily and understandingly and with a specific intent to violate* the law.

One who knowingly and willfully joins an existing conspiracy is charged with the same responsibility as need be one of the instigators of it. (Emphasis added.)

The court then instructed on the proper consideration of *coconspirator* acts and statements:

Acts of co-conspirators. When persons conspire with each other for a common, unlawful purpose, they are considered as partners or agents of each other, and accordingly each is responsible for and bound by the conduct and the words of the others in furtherance of the common conspiracy.

So here in this case, *if independent evidence establishes that a combination for a common and unlawful purpose actually was formed,* then any conversations or acts of one party in furtherance of a common purpose may be considered by you in determining the guilt or innocence of any *other party who was a member at the time of those conversations or acts.* (Emphasis added.)

While the requested instruction focused on telling the jury when coconspirator acts and statements could *not* be used against a defendant, the instruction as given simply stated the obverse—that they were properly admitted against one *who had been proven to be a member* of the conspiracy at the time.

The trial judge then concluded with the following summary on *proof of a conspiracy:*

So in summary: In order to establish the offense of conspiracy as charged in the indictment, the evidence must show beyond a reasonable doubt, first, that the conspiracy described was formed and existing at or about the time alleged.

Second, *that the accused persons knowingly* and *willfully became members of a conspiracy.*

Third, that one of the conspirators thereafter knowingly committed at least one of the charged overt acts in furtherance of that conspiracy.

In considering whether or not the crime of conspiracy as charged in the indictment has been proved, you must give separate consideration to the case of each of the several defendants. (Emphasis added.)

Regarding these instructions and summary as a whole, we find no error.[9]

*Fifth Amendment Claim.*

■ Finally, the appellants allege that the government's direct examination of the arresting officer resulted in evidence that the defendants had exercised their fifth amendment self-incrimination privilege at the arrest and had thus unfairly raised an inference of guilt in the minds of the jurors.

During the course of the trial the prosecuting attorney questioned the arresting officer about the sequence of events at the arrest, including whether the defendants were given their *Miranda* warnings, and what those warnings were:

Q And as part of your job as arresting officer did you advise the defendants of their *Miranda* rights?

A Yes, I did.

Q And those are what?

A "You have the right to remain silent . . . ."—

MR. THOMPSON: Object, Your Honor. That's irrelevant to this hearing.

THE COURT: You may tell us.

THE WITNESS: Okay. "You have the right to remain silent. Anything you say can and will be used against you in a Court of law. You have the right to an attorney to be present now or at any time during the questioning. If you cannot afford an attorney, one will be presented to you without cost," and, "Do you understand your rights?" And I asked each defendant and they either replied, "Yes," or nodded their head.

MRS. MONTGOMERY: Thank you. I have no further questions.

The government contends that it asked the question only to show that the police had not violated established procedures in what the government describes as a "volatile arrest situation." Defense counsel objected, contending that the recitation of rights would allow the jury to impermissibly speculate that the defendants had chosen to remain silent, and that they did so because they were guilty, or further, that they had not testified at trial because they were guilty.

We do not condone the practice of asking the questions which the prosecutrix asked in this case, and think it is clearly advisable that it should not be done. However, in this case the officer was *not* asked how the defendants responded when advised of their right to remain silent, and the officer did not volunteer an answer. Thus, there was no evidence before the jury that the defendants had remained silent at the arrest, nor was the colloquy at trial of such character "that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Williams,* 503 F.2d 480, 485 (8th Cir. 1974).

Assuming however that it was error, and that it impermissibly allowed the jury to speculate on the appellants' failure to take the stand, we consider the error harmless in this case. The government did not pursue the point further, and did not mention it in closing argument. Defense counsel thereafter refused the court's offer to instruct the jury to disregard the arresting officer's testimony. *United States v. Wycoff,* 545 F.2d 679, 682 (9th Cir.), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977); *Jones v. Wyrick,* 542 F.2d 1013, 1014 (8th Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977). The defense also refused a final instruction which would have told the jury that no inference of guilt could be drawn from the defendants' failure to take the stand.

Moreover, the evidence against the appellants, except Cleo Brown, was substantial. We are convinced the error, if any, is harmless beyond a reasonable doubt. *Jones v. Wyrick, supra,* 542 F.2d at 1014; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

9. Appellants' final objection, directed to the "overt act" portion of the summation, is completely without merit.

*Cleo Brown: Sufficiency of the Evidence.*

Appellant Cleo Arthur Brown has attacked his conviction separately from the other defendants. Cleo Brown received a six-year sentence. He was convicted on one count which charged him with a conspiracy to distribute heroin with the other appellants, plus Michael Rush and Laura Figone, on or about March 24, 1977, and continuing until the date the indictment was returned.

Cleo Brown's separate challenge to his conviction is based upon the following: (1) the insufficiency of the evidence to sustain the jury's guilty verdict and (2) the inadmissibility of certain exhibits described as "drug notes" and the testimony of the government's expert who interpreted them, Agent John Boulger. Because we conclude that the evidence, including the drug notes, is insufficient, we do not reach Brown's second contention.

We are mindful of the fact that "[i]n reviewing a jury finding of guilt in a criminal case, an appellate court is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences to support the conviction." *United States v. Rich,* 518 F.2d 980, 984 (8th Cir. 1975), *cert. denied,* 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976). Moreover:

> Once the existence of a conspiracy has been established by satisfactory proof, a particular individual's participation may be established by evidence that otherwise seems slight. *United States v. Verdoorn,* 528 F.2d 103, 105 (8th Cir. 1976); *United States v. Baumgarten,* 517 F.2d 1020, 1026 (8th Cir.), *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); *United States v. Overshon, supra,* 494 F.2d 894 at 896 (8 Cir.); *United States v. Hutchinson,* 488 F.2d 484, 490 (8th Cir. 1973), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974).

*United States v. Hassell,* 547 F.2d 1048, 1052 (8th Cir.), *cert. denied,* 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977).

■ Circumstantial evidence will suffice as proof, and does not diminish the case against a defendant. *Id.* And, "we are guided by the general rule that 'it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty.'" *United States v. Cox,* 580 F.2d 317 at 323 (8th Cir. July 14, 1978). *United States v. Jackson,* 549 F.2d 517, 529–530 (8th Cir. 1977).

■ Nevertheless, a defendant's participation in the conspiracy must be shown, with proof "that the defendant 'knowingly contributed * * * efforts in furtherance of it.' *United States v. Jones,* 545 F.2d 1112, 1115 (8th Cir. 1976) [*cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977)]," *United States v. Scholle,* 553 F.2d 1109, 1118 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). "Knowledge of the existence or acquiescence in a conspiracy does not serve to render one a part of the conspiracy. There must exist some element of affirmative cooperation or at least an agreement to cooperate." *United States v. Collins,* 552 F.2d 243, 245 (8th Cir.), *cert. denied,* 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977).

■ In this case we have concluded that the evidence does not sufficiently link Cleo Brown with the conspiracy charged, or establish sufficiently that he participated in the scheme. While the government is entitled to the benefit of all reasonable inferences from the evidence, where the evidence "is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." *United States v. Kelton,* 446 F.2d 669, 671 (8th Cir. 1971).

The government, in support of its position that the verdict be upheld, has cited numerous portions of the transcript. For purposes of analysis, we divide the evidence offered against Cleo into three parts: (I) evidence establishing Cleo Brown's presence at specified times and places and his association with known conspirators, including his presence the night of the arrest, (II) items found on Cleo Brown's person the night of

the arrest and (III) "drug notes," or notations made by an unknown author which were found at the Colfax and Dupont residences.

With respect to the first category of evidence, the government claims that it proved the following: (1) Cleo Brown was photographed and shown to be present at his brother Leo's apartment on April 1. Laura Figone had visited that apartment that day after making a heroin sale to the undercover agent. Cleo was present at the time Figone visited. (2) On August 15, Figone entered the large apartment complex where Cleo lived apparently to obtain heroin for a sale to the agent. It is not known which apartment Figone entered. However, a black man identified by surveillance as "one of the Browns" watched Figone leave as he stood on the balcony of an apartment *neighboring* Cleo Brown's apartment. The neighboring apartment was rented by two Caucasians for whom *Leo* Brown had provided reference and had guaranteed the rent. An earlier statement by Michael Rush to the undercover agent Belkair indicated, however, that *Leo* Brown at this time may have been back at Figone's residence.[10] (3) Rush had told Agent Belkair that Figone had two heroin stashes, one being "on the border of Richfield." Geographically, Cleo Brown's address would be near the Edina-Richfield border. (4) Laura Figone's utility bills at the former residence were billed to Cleo Brown. (5) Cleo was seen entering his brother's apartment in the early morning hours on September 12, and was later arrested there with the other defendants.

■ Of these items of evidence, the second is more clearly probative than the rest. The first and the fifth items do show that Cleo Brown twice was present at the apartment of his brother after the approximate time that Figone had completed drug sales to the agent; all the cited evidence shows that Cleo associated with those who, it was established, were involved in drug sales and a conspiracy to deal in drugs. However, Cleo's association with his brother, and others convicted of crimes, is not sufficient to establish his complicity in the criminal activity. "It is undisputed that guilt cannot be inferred from the mere presence of a defendant at the scene of the crime or mere association with members of a criminal conspiracy." *United States v. Graham,* 548 F.2d 1302, 1312 (8th Cir. 1977); *United States v. Scholle, supra,* 553 F.2d at 1118. In *United States v. Kelton, supra,* 446 F.2d at 671, this court reversed the conviction of one defendant, Kelton, charged with aiding and abetting the commission of a robbery. The evidence showed that the defendant had lent a shirt to one defendant, and had handled the gun later used in the robbery; however, there was also evidence that Kelton was not present in the bedroom when the robbery was planned, nor did the government prove that Kelton had knowledge of the intended uses of the gun and shirt.

> The necessity for proving facts other than presence has been explained as "an essential safeguard against the ever present danger of *assuming the complicity* of all in attendance whenever group activity is involved * * * The courts have the responsibility to make sure that mere speculation is not permitted to substitute for proof in such cases. (Emphasis ours). *United States v. Barber,* 429 F.2d 1394, 1397 (3 Cir. 1970).

*Id.* at 671.

In this case, proof of Cleo Brown's presence at his brother's apartment, once with Laura Figone present, and once on the night of the arrest, is not of itself proof of his participation in the conspiracy charged.

The second item of proof concerning Figone's foray to the Gallagher address is suspicious, but fails to establish Cleo Brown

---

**10.** Agent Belkair described her conversation with Michael Rush outside of Figone's residence, just prior to the time Figone left her residence to get the heroin:

> We parked right there, and I told Rush to go in and talk to his lady and convince her to

meet me before I gave him the money, or before I purchased the half ounce that day. So he got out and went into the entryway over here. He was gone a few minutes, and then he came back. He said that—he said her old man is there.

as the source of the heroin or as a member of the conspiracy. It is proved that Figone entered the apartment complex, apparently to get heroin, but it is not known whose apartment she entered once inside. The black man who watched her leave was not standing on the balcony of Cleo Brown's apartment, but on a neighboring balcony; the black man was identified as "one of the Brown twins," but was not identified as *Cleo* Brown. While it may very likely have been *Cleo* Brown, without proof of Figone's movements inside the apartment complex, the evidence is too attenuated to further infer that she entered Cleo Brown's apartment, and that once inside, she got the heroin from him, and not someone else.

A similar set of facts is presented in *United States v. Holder,* 560 F.2d 953 (8th Cir. 1977), where this court found insufficient independent evidence of a conspiracy to permit the introduction of hearsay statements under the coconspirator rule. In that case the go-between, Nunn, like Figone, went to the defendant Holder's apartment, ostensibly to get heroin. It was proved that Holder had on a previous occasion distributed heroin, and that the heroin on the night in question was packaged identically as in the former sale. On the night in question, Nunn was seen entering Holder's apartment and exiting five minutes later. Holder stated at his arrest that he lived *alone* in the apartment. These facts were held to be insufficient to establish that Holder was involved in a drug-dealing conspiracy with Nunn:

> The jury could only speculate as to who was in Holder's apartment on the evening of November 18. Holder was not observed entering his apartment on that evening. Assuming, though, the jury concluded that Holder was in the apartment, there was no evidence that he was alone on that evening or that he actually possessed and transferred the heroin to Nunn. No transaction was observed and Nunn was not searched before entering Holder's apartment. Thus, it was not

shown that Nunn did not have the narcotics on her person before entering the apartment or that the transfer was not made by another individual in the apartment that evening. We conclude, therefore, that the conversations between Nunn and Adams were inadmissible against Holder and, upon Holder's objection, should have been stricken from the record.

*Id.* at 957–958.

Similarly, the circumstances here are too inconclusive to establish Cleo Brown, as opposed to someone else in the complex, as the heroin source, or to otherwise link him with participation in a conspiracy with Figone.

■ The second type of evidence offered to prove Cleo Brown's participation in the conspiracy consists of the articles found on his person at the time of his arrest. While the items are suspicious, they do not prove his guilt. The money found sewn into his jacket was not marked money; the tablespoon also found in the jacket's lining had no traces of heroin. Proof that Cleo Brown, a presently unemployed person, possessed a substantial sum of money is not of itself sufficient to prove his commission of the crime charged. *See, e. g., United States v. Kelton, supra,* 446 F.2d at 671.

■ Finally, we assess the probity of the "drug notes" offered into evidence in this case. In the searches of 2509 Dupont and 2753 Colfax a red notebook and numerous pieces and scraps of paper with handwritten notations were found. Some of the pieces of paper were found in a kitchen drawer at Dupont; the record book was found in the bedroom at Colfax, and several pieces of paper were found in the safe at Colfax. A government witness, offered as an expert, gave his opinion on the significance of the writings.

The expert's testimony relative to the red notebook did not link the notebook with drug sales and was nonspecific;[11] the government relies chiefly on his testimony interpreting the notations on the pieces of

---

11. Regarding the notebook, Agent Boulger said only:

In this particular case it seems to be a cash ledger of money going in, coming out. Expenditures describing IOU's from Laura and Leo, describing a trip to and from L.A. and money owed to one person from another person.

paper found in the kitchen drawer and in the safe.

The exhibits alleged to be "drug notes" consisted of numerous pieces and scraps of paper, of various shapes and sizes, penned in several colors of ink and pencil, and written in different types of handwriting. It is not known who wrote them, and they are not dated.

The government expert pointed to several portions of them which were significant to him, and which he considered to be notations about drug trafficking. One piece of paper showed a column, along with other notations the expert did not testify about. The column had numbers, with words written next to most of the numbers. One of the words was "blow," next to the number 550; another said "Leo 400" and "Cleo 550." The agent testified that "Blow is a frequent slang term for cocaine." He later testified that 550 could relate to a quarter ounce of heroin or it could relate to another quantity, if it was cocaine.

One piece of paper also had numbers, some with names behind them, including the names Mick (275), Cleo (250), and Rich (275). Another piece of paper regarded as significant showed in part the following:

R— 275.00—⅛ & 550.00—¼

M— 250 check & 25.00 cash—⅛

M— 275—⅛—

The thrust of Boulger's testimony was that the government was paying $275 for one-eighth ounce of heroin, and $550 for one-quarter ounce of heroin, which he felt corresponded to the various notations just described.

Cross-examination of Boulger showed that other numbers, such as "110" and "270," and other names, such as "Pam" did not have any meaning to him. He stated it would be speculation as to when and where the notes were written, but that he would speculate that the notation about one-

eighth and one-quarter, due to the prices next to them, would relate closely to the dates the government was purchasing heroin. He testified that other notations such as "I owe you, Cleo, 300; Stan 200" could be. IOU's for drugs received, or admittedly, for some other purpose.

In our estimation these notes, even with the testimony of Agent Boulger, are not sufficient to prove Cleo Brown's participation in the conspiracy as charged. The one piece of paper which referred to fractions and figures preceded by an "R" and an "M" did not mention Cleo or bear Cleo's initials, even if we accept the testimony that they do refer to drug sales. While another piece of paper did show "Cleo 550" and "blow 550," the agent then testified that blow could refer to cocaine in drug culture slang.[12] Other numbers and names in the same column had no meaning to the agent. It is not apparent whether "Cleo 550" referred to money owed or paid to him, or whether that was money he may have owed someone else for drugs he had purchased. No dollar signs appear next to the numbers, and no dates appear on the paper to correlate the notes to the time of the conspiracy.

The agent's testimony that the government was selling drugs to Figone at particular prices (plus a middleman's fee), and the agent's opinion that some of the numbers on the notes correlated with these prices, are the sole sources of the inferences that "Cleo 550" or "Cleo 250" refer: to drug sales, to money Cleo received or was owed for his part in the sale of drugs, to the particular conspiracy charged, or to the particular time charged. Even viewing the testimony in the government's favor, we find it insufficient to reasonably establish guilt of the crime charged.[13]

As this court recited in United States v. Frol, 518 F.2d 1134 (8th Cir. 1975), a case in which a jury verdict of guilt was overturned on a charge of unlawful possession of heroin with intent to distribute:

12. Offenses involving heroin, not cocaine, are involved in this case.

13. Compare the probity of the notations here with the carefully kept records admitted in

United States v. Wilson, 532 F.2d 641 (8th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), which specifically referred to drugs, dollar amounts, dates, names—all written in complete sentences. An informant

If the evidence is such that a reasonable person *may* have a reasonable doubt as to the defendant's guilt, the case should be submitted to the jury. On the other hand, a trial judge should not permit a case to go to the jury if the evidence is so scant as to allow the jury merely to speculate or to conjecture as to the defendant's guilt. In other words, a motion of acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged. *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973).

*Id.* at 1137. The facts of this case require that we vacate the judgment of conviction.

Accordingly, we vacate the judgment of conviction of Cleo Brown and remand to the district court with instructions to enter a judgment of acquittal. The convictions of the other appellants are sustained.

in that case also testified that the defendant kept notebooks of their drug transactions. *Id.* at 645. The court in *Wilson* concluded that the

notebooks were properly admitted, and that their evidential value outweighed any prejudice.