Opinion
 

 MOORE, J.
 

 Gilberto Sanchez Villada, Catalina Harvey, and Fabio Leon Gil, along with defendant Maria Otilia Villada, were charged in a criminal information with conspiracy to sell or transport cocaine and conspiracy to possess cocaine for sale. (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, §§ 11352 and 11351). The information charged one or more of the defendants with 27 overt acts in furtherance of the conspiracy. Defendants were also charged with possession for sale of cocaine (Health & Saf. Code, § 11351) with an allegation the cocaine possessed for sale exceeded 100 pounds by weight (Health & Saf. Code, § 11370.4, subd. (a)(4)) and a further “probation ineligibility” allegation the amount sold or possessed for sale exceeded 57 grams. (Pen. Code, § 1203.073, subd. (b)(1).) Defendants waived jury and, during a court trial, a Penal Code section 1118 motion to dismiss was granted as to defendant Maria Otilia Villada. Defendants Gilberto Sanchez Villada, Catalina Harvey, and Fabio Leon Gil were found guilty by the court of all of the charged crimes. The weight allegations were also found to be true.
 

 
 *670
 
 Defendant Gilberto Sanchez Villada was sentenced to the mitigated term of two years in state prison on the possession for sale charge. A 15-year enhancement pursuant to Health and Safety Code section 11370.4, subdivision (a)(4) was also imposed, for a total term of 17 years. Sentence on the conspiracy count was imposed and stayed pursuant to Penal Code section 654.
 

 Defendant Catalina Harvey was sentenced to the midterm of three years on the possession for sale charge. The court also imposed the 15-year enhancement pursuant to Health and Safety Code section 11370.4, subdivision (a)(4), for a total term of 18 years. Sentence on the conspiracy count was imposed and stayed.
 

 Defendant Fabio Leon Gil was sentenced to the aggravated term of five years in state prison on the conspiracy charge. The court also sentenced defendant to the midterm of three years on the possession for sale charge, but ran that sentence concurrent to defendant’s five-year sentence on the conspiracy charge. The weight enhancement pursuant "to Health and Safety Code section 11370.4, subdivision (a)(4) was ordered stricken.
 

 On appeal defendant Gilberto Villada contends the trial court erred in admitting evidence of drug and money ledgers; in admitting expert opinion as to cocaine transactions; in denying his motion to dismiss for insufficient evidence; in denying his motion to suppress based on police officers’ alleged failure to comply with “knock-notice” and in failing to exercise the discretion to impose a sentence enhancement less than the entire 15 years pursuant to Health and Safety Code section 11370.4, subdivision (a)(3).
 

 Defendant Harvey contends the court erred in admitting evidence of drug and money ledgers; in admitting expert opinion as to cocaine transactions; in denying her motion for acquittal pursuant to Penal Code section 1118 and in imposing the 15-year sentence enhancement.
 

 Defendant Gil contends the trial court erred in failing to grant his motion to dismiss pursuant to Penal Code section 1118; in allowing expert opinion testimony as to cocaine transactions; in allowing the introduction of drug and money ledgers and in imposing sentences for both possession of cocaine for sale and conspiracy to possess cocaine for sale.
 

 I
 

 Facts
 

 A joint investigation by federal, state and local law enforcement agencies named “Operation Polarcap” focused on money laundering operations taking
 
 *671
 
 place in a wholesale jewelry business in downtown Los Angeles called “Ropex Incorporated.” A federal court order was obtained authorizing the installation of a surveillance camera inside Ropex. Law enforcement also targeted “money runners,” those individuals who brought drug proceeds from narcotics dealers to Ropex. It was through the surveillance of one particular money runner, Eduardo Ortiz, that law enforcement became aware of the activities of the defendants.
 

 The cogent facts of this case begin on November 21, 1988. Law enforcement officers were following and surveilling Ortiz, whom they had seen delivering money to Ropex. Ortiz was observed with an individual by the name of Javier Villada behind a Denny’s restaurant in Costa Mesa. Each was in a separate car. After meeting, they drove about two blocks to a dead end street and spoke to one another. Javier Villada handed Ortiz a cardboard box, which Ortiz put in his car.
 

 After his meeting with Ortiz, Javier Villada was followed to the South Coast Plaza Mall in Costa Mesa. He parked his car in the parking lot and sat in it for about 20 minutes. He got out of his car and made a phone call at a pay phone. He reentered his car and drove across the street to a gas station, where he began filling his tires with air. He continued to watch traffic during the time he was in the gas station. He got back into his car and drove to a K mart located in the City of El Toro. He made another call from a pay phone. He then drove to a residence on Eaglemont Avenue in the City of El Toro. He left the residence about 20 minutes later with one of his cousins, defendant Gilberto Villada. They drove together to a post office in El Toro. Javier Villada went inside the post office, while Gilberto Villada made a 30-minute phone call. This call appeared to law enforcement officers to be a credit card call or a “beeper” call. During Gilberto Villada’s phone call, Javier Villada came out of the post office and was handed the phone. Javier spoke for a short time and handed the phone back to Gilberto. After the call, they drove back to the Eaglemont residence.
 

 Later that day, they left the Eaglemont residence, got into separate cars, and drove to the John Wayne Orange County Airport. The gold Pontiac driven by Gilberto Villada was returned to the Avis Rent-A-Car lot. Javier Villada had recently been arrested for driving under the influence in the car that was returned.
 

 Javier Villada returned to the Eaglemont residence. He later came outside accompanied by two women, Nancy LeDesma and Maria Otilia Villada. Nancy LeDesma was Javier’s fianc$’ee. Maria Otilia Villada was Javier and Gilberto’s aunt. The three individuals drove to the Mission Viejo shopping plaza and went into a Montgomery Ward store. Javier received a beeper call
 
 *672
 
 and left the store by himself. He drove to the Laguna Hills shopping plaza and parked in the parking lot. After waiting a few minutes, he entered the Broadway store. He came out of the store accompanied by defendants Catalina Harvey and Fabio Gil. They got into Javier’s car and drove around the parking lot as they talked. Harvey and Gil got out of Javier’s car and into a black Mercury Merkur. Javier returned to the Montgomery Ward store.
 

 After the meeting between Eduardo Ortiz and Javier Villada, Ortiz and another person entered Ropex. The other person carried a briefcase which contained approximately $100,000 in bundles held together by rubber bands. Ortiz carried a cardboard box which contained approximately $300,000. The money was processed through a money counting machine and wrapped in paper.
 

 On December 1, 1988, Gilberto Villada left the Eaglemont residence and drove to a security-type apartment complex at Second and Mariposa Streets in Los Angeles. He carried a blue gym bag which appeared to be very heavy and was let into the security complex by someone inside after speaking into an intercom. Shortly thereafter, he was seen standing inside the gated garage area of the apartment complex speaking with a Latin male who, in turn, was speaking on a portable cellular telephone. After the two spoke for several minutes, Gilberto Villada left the garage area, got back into his car, and drove back to Orange County. The blue gym bag which he was carrying appeared to be significantly lighter than it had been upon his entry.
 

 On December 2, Gilberto Villada left the Eaglemont residence and drove to the Laguna Hills shopping mall, where he drove up and down the aisles of the parking lot without parking. He then drove to an area near the front of a Broadway store, where Fabio Gil was walking with two children. The two spoke for several minutes.
 

 Fabio Gil went into the Broadway store with the two children and then left the store. He walked over to a pay phone and made two beeper-type calls. After the second, the phone rang and Gil spoke for several minutes to the person on the other end of the line. He left the parking lot with the two children, driving the black Mercury Merkur and drove to a townhome on Sunstream in the City of Irvine. Gil, Harvey and Harvey’s mother left the Sunstream townhome together and drove to a security-type apartment complex at La Brea and Coliseum Streets in the City of Los Angeles. It was late afternoon and traffic was bumper to bumper the entire way. They pressed an intercom-like device and were admitted into the security complex. Harvey was seen inside one of the apartments speaking with a Black gentleman.
 
 *673
 
 Minutes later, the three individuals left the apartment and drove back to Orange County.
 

 On December 5, Gilberto Villada left the Eaglemont residence and drove to the parking lot of a Denny’s restaurant. He drove around the lot, left, and drove to the parking lot of a Fedco store. He drove around that lot and stopped near a wall. He got out of the car, looked around, got back into the car and drove to a Chevron gas station. He pulled into the parking lot of an adjacent motel, where another car joined him. The two cars drove in tandem to a nearby residential area, where they parked next to one another. The driver of the other car was Eduardo Ortiz. Ortiz walked over to Gilberto’s car, removed a cardboard box from the back of the car, and placed it in his own car. Both individuals then drove away.
 

 Several hours later, Ortiz entered Ropex with another individual. He was carrying a cardboard box; the other individual also carried a cardboard box. The boxes were opened and contained stacks of money wrapped in rubber bands. Money from each box was counted, and a bundle containing $10,000 was then handed to Ortiz, ostensibly as his commission. Ortiz had a pager which continually went off during this transaction. He also had a cellular phone which he used. The amount of money in Ortiz’s cardboard box was in excess of $200,000. The box appeared similar to the one taken from Gilberto Villada’s car.
 

 Gilberto Villada returned to the Eaglemont residence after his meeting with Ortiz. Two women then arrived. One was Nancy LeDesma and the other was Miryam Villada, another cousin of Javier and Gilberto Villada. Miryam Villada carried a suitcase into the residence. She returned to her car and removed two smaller suitcases and a cardboard box. One of these suitcases and the cardboard box were placed in her trunk and the other suitcase was taken into the residence. During this time, Gilberto Villada assisted LeDesma in taking a large, heavy cardboard box from the front seat of her car, which was also carried into the residence.
 

 Later that afternoon, Miryam Villada left El Toro and drove to a town-home on Wilson Street in Costa Mesa. She next drove to the parking lot of a Fedco store, stopping by a wall. She got out of her car and looked down the aisles of the parking lot. A second car drove up, and the driver, Ivan Dario Mendez, spoke with her. During the conversation, Mendez also looked down the aisles of the parking lot. Miryam Villada twice transferred objects from her car to Mendez’s car. Mendez and Miryam Villada then left separately.
 

 Mendez drove to the parking lot of the Price Club in Santa Ana, during which time he used a cellular car phone. He met an individual by the name
 
 *674
 
 of William Downing. Mendez took a box out of his car and placed it in a nearby shopping cart. He pushed the shopping cart over to Downing’s truck, and Downing took it out of the cart and placed it in his own car.
 

 At this point, officers arrested Downing and Mendez and searched their vehicles. Mendez’s vehicle contained over $5,000 in cash, a pager and 10 kilograms of cocaine which were marked “Levi.”
 
 [1]
 
 Downing’s pickup truck was searched and a cellular phone, police scanner and $1,700 in cash were found. Downing had a pager. The cardboard box which Downing had been given by Mendez was searched and found to contain 10 kilos of cocaine marked “Y7X8.”
 

 Mendez’s house in Sylmar was also searched and $15,000 in cash was found. Officers searched three other residences on December 5. The Eaglemont residence in El Toro was searched pursuant to a warrant. Two women were present when officers entered the residence, Maria Nunez and her mother, Julia Navarro, both of whom were friends of Javier and Gilberto Villada. Approximately $14,000 in cash wrapped in packets with rubber bands was found in one of the bedrooms. In the same bedroom, numerous documents bearing Gilberto Villada’s name were found in a brown pouch. The pouch also contained a piece of paper with Catalina Harvey’s name and telephone number. Inside a trash can in the same bedroom, a calculator, note pads, rubber bands and a piece of paper containing ledger-type entries with money amounts were also found. These amounts corresponded with the money found in the bedroom.
 

 A search of the garage revealed 4 boxes which contained 47 kilos, 45 kilos, 44 kilos and 44 kilos, respectively, of cocaine. These boxes bore the markers “Texas,” “Orient,” “Cali,” and “Casio.”
 

 A search warrant was executed at the Wilson Street townhome in Costa Mesa. Maria Otilia Villada, the only person at that residence, was arrested. There was very little furniture in the residence, and 92 kilos of cocaine were found stacked against a bedroom wall, bearing the markers “Levi,” “Y7X8,” “Pato” and “Pio-1.” Tape, marking pens, rubber bands and cardboard boxes were found in the garage. Papers were found which appeared to be ledgers documenting the movement of kilos of cocaine. An airline receipt with Maria Villada’s name on it was found, as well as a Colombian identification card bearing her name.
 

 The Sunstream residence in Irvine was also searched, though not pursuant to warrant. Officers went to the door, knocked, and announced themselves as
 
 *675
 
 police officers. Catalina Harvey told the officers to wait a minute, and the door was opened by Fabio Gil approximately one and a half minutes later. The officers asked Gil for his permission to search the residence and he consented. An “O’Haus” scale was found under a staircase. A purse, wallet and papers were found on a kitchen counter. The purse contained various items bearing the name “Catalina Harvey,” and the wallet contained items bearing the name “Fabio Gil.” The papers appeared to be ledgers, and bore the notations “Y7X8” and “Levis,” along with numerical amounts. An address book was found inside the purse which indicated a cellular phone number and a beeper number for “Catalina” as well as a phone number for someone named “Alvaro.” Harvey told the officers the documents and the address book were hers. The Mercury Merkur which Harvey and Gil had driven was found in the garage. A cellular phone was found inside the car which was registered to a “Sandra Rodriguez.” Department of Motor Vehicles records were later checked, and they revealed a driver’s license bearing defendant Harvey’s picture and the name “Sandra Rodriguez.”
 

 Officers found Harvey’s mother upstairs in a bedroom, lying on a pillow. They asked her if they could look under the pillow and she agreed. Eighteen thousand dollars in cash, packaged with rubber bands and enclosed in a plastic bag was found under the pillow. Harvey told the officers the money was “ours.” A large quantity of rubber bands were found in a plastic container hidden inside a clothes hamper in the same bedroom. Harvey and Gil were arrested.
 

 Prosecution Case
 

 In addition to the foregoing, it was shown defendants Villada and Harvey each had various post office boxes under their control. Their driver’s licenses listed post office boxes as their addresses. The documents found at the Eaglemont residence were compared to an exemplar taken from Gilberto Villada. A document examiner concluded those documents “may have” been written by him. Likewise, an exemplar taken from Catalina Harvey was compared to the documents found in the Sunstream residence. The document examiner concluded parts of those documents “may have” been written by her, but that at least one other individual had made entries on portions of the documents. The records from Harvey’s cellular phone showed two calls on December 3 to the number listed in her address book under “Catalina-beiper
 
 [sic]."
 
 Approximately seven calls were made on December 3 to the number listed under the name “Alvaro.” Four calls were made on December 3 and one on December 5 to the number which appeared under the name “Fabio.” Evidence also established that Miryam Villada paid the rent on the Wilson Street townhome in Costa Mesa.
 

 
 *676
 
 The primary prosecution witness was Agent Wilfredo Cid of the California Department of Justice’s Bureau of Narcotics Enforcement. Cid testified as an expert on cocaine trafficking and the methods employed by Colombian cocaine distribution “rings” or “cells.” He testified that beepers or pagers, cellular phones, public pay phones, and the use of codes with beepers are methods commonly used by Colombian cocaine traffickers and dealers. U-Haul-type boxes are frequently used to carry money or cocaine and rubber bands are used to package money in groups of a certain monetary amount by traffickers. In these trafficking organizations or cells, “stash houses” are frequently used to store large amounts of money and/or large amounts of cocaine. “Pay-owe” ledgers are frequently found in places associated with these traffickers which document the movement of cocaine and/or money. Cid testified these types of records are frequently informal and only become more formal or organized the higher up in the cell one goes. These records can be kept on scraps of paper, napkins or anything that can be written on. Members of these cells frequently employ “countersurveillance” driving, wherein the use of parking lots, numerous stops, frequent lane changes and other devices are used to ensure that one is not being followed. They also use multiple driver’s licenses and post office boxes to conceal their activities.
 

 Cid was allowed to testify, over defense objection, as to the nature of the documents which he found in both the Eaglemont and Sunstream residences. The documents found in Eaglemont were consistent with pay-owe ledgers and indicated that 10 kilograms of cocaine had been sold at $12,500 apiece, which was the going price for kilo quantities of cocaine at the time of these offenses. Cid testified in similar fashion as to the documents found in Sunstream. These documents were also, in part, pay-owe ledgers indicating cocaine and money transactions.
 

 Portions of the pay-owe ledgers found at the Irvine residence indicated the notation “Fabio debo,” followed by some figures. Cid testified as both an expert and a native Spanish speaker that this indicated someone named Fabio either owed or was owed a certain amount of money, and that the figures following those words were consistent with narcotics activity.
 

 Cid also testified over defense objection as to the significance of various things which either he or his fellow officers had seen during the course of their surveillance. The meeting between Eduardo Ortiz and Javier Villada was a drug-related activity. The return of Javier’s car by Gilberto Villada was consistent with the activities of members of Colombian cocaine distribution cells, as these individuals frequently get rid of cars in which they have been arrested or in which other legal problems may have arisen. The meeting between Catalina Harvey, Fabio Gil, and Javier Villada was also
 
 *677
 
 consistent with a meeting between cocaine dealers to arrange or discuss a narcotics transaction. The type of driving seen during this meeting and others manifested the sort of countersurveillance driving techniques that Agent Cid had become familiar with in investigating Colombian cocaine cells. The contact between Gilberto Villada and Fabio Gil involved some sort of business activity related to narcotics. The use of cellular phones, beepers, and beeper calls was also consistent with narcotics activity, since these types of calls are harder to trace back to a source telephone and thus difficult to tap or monitor.
 

 Gilberto Villada’s trip to Los Angeles, wherein he entered with a heavy blue gym bag, spoke to an individual in the underground garage, and then left with his bag being considerably lighter, was also consistent with a narcotics transaction. The meetings between Gilberto and Eduardo Ortiz, between Miryam Villada and Ivan Dario Mendez, and between Mendez and William Downing were cocaine transactions. The trip to Coliseum Street in Los Angeles by Fabio Gil, Catalina Harvey and her mother was consistent with a narcotics transaction.
 

 Agent Cid testified he believed Maria Otilia Villada was merely a “keeper” for a stash house. He opined Gilberto Villada was a “distributor/trafficker,” and that he had, to some extent, assumed the position previously held by Javier Villada within this cell.
 
 [2]
 
 Cid testified defendants Fabio Gil and Catalina Harvey were cocaine dealers. He drew a flow chart which indicated where these various designations would be found within an organization. In terms of a continuum going from the bottom, which would be a street dealer, to the top, which would be the main cocaine distributor or trafficker, Gilberto Villada was placed the highest and former defendant Maria Otilia Villada the lowest, with Fabio Gil and Catalina Harvey somewhere in between, though closer to the top than the bottom.
 

 Defense
 

 Various individuals testified on behalf of Gilberto Villada. Several testified he had visited them prior to coming to California. No drug activity was observed while he stayed with them.
 

 A friend of Gilberto named Teresa Terboda testified she lived at the apartment on Mariposa Street in Los Angeles that he visited on December 1.
 
 *678
 
 She testified he brought her a wedding dress, silver goblets and sport shirts for her upcoming trip to Colombia, all of which were contained within a blue gym bag.
 

 Gilberto Villada testified he was a Colombian resident who was on vacation in California at the time he was arrested. He testified he had previously been back East and had come to California at the invitation of Christina Nunez, one of the residents of the Eaglemont residence. His cousin, Javier Villada, was also staying at the house. Gilberto stated he had been traveling with his sister, but she decided to stay behind in Miami because she was completing an English class. He was also enrolled in the class but was doing poorly and decided to forego the remainder of the class when he received Nunez’s invitation. When evidence was offered by the prosecutor showing that the class had ended prior to his departure from Miami, Gilberto indicated he was taking another class as well. He explained his various credit card and beeper-type calls as being innocent activity. He testified the cardboard box which he gave Eduardo Ortiz had been given to him by Javier with the instruction that he not ask any questions and simply deliver it to Ortiz. He claimed Javier told him the box contained $30,000, though he admitted he knew the box contained a greater amount of money due to its weight.
 

 Gilberto testified he believed he knew Fabio Gil from Medellin, Colombia and had met with Gil in order to have lunch. However, since he was not feeling well, the lunch did not take place. The incident on Decembér 5, where he assisted Miryam Villada and Nancy LeDesma with a heavy box taken from their car was also innocent; the box contained only a television set. The rubber bands and documents found in the Eaglemont residence had been brought there by Nancy LeDesma. He had Catalina Harvey’s phone number because Javier had given it to him for the purpose of contacting Fabio Gil. His erratic driving occurred on the freeway and streets because he was lost, and, in the parking lot, because he was looking at boys walking by.
 

 Catalina Harvey also took the stand in her defense. She testified she had formerly been a cocaine dealer, along with her husband, and had sold in quantities of up to five kilos. After she and her husband separated in mid-November of 1988, she stopped dealing cocaine. Fabio Gil moved in with her as a boyfriend. She previously had two suppliers, a “Favio Montano,” and a later supplier who took over from Favio when Favio went to jail. This later supplier she could not identify for fear of placing her life and the lives of her children in jeopardy. Though she had not sold drugs since mid-November of 1988, Harvey testified she desired to get back into the business in order to support herself and her children after her separation. In
 
 *679
 
 need of a new supplier, she called a friend of hers in Colombia named “Alvaro.” Alvaro told her to call Javier Villada, and gave her a phone number, which she placed in her address book under the name “Alvaro.” She met with Javier for the purpose of establishing him as her supplier, but Javier indicated he had to go to Miami and could not do anything until his return. That was the last time she saw him or spoke to him. Harvey testified Fabio Gil knew nothing about what was going on. When Gil accompanied her to the meeting with Javier Villada, she and Javier spoke in English purposely so Gil could not understand them.
 

 Harvey testified she had never met Gilberto Villada or Maria Villada prior to the commencement of court proceedings. She explained the telephone calls to the number under “Alvaro” in her book, made from her cellular car phone, were attempts to contact Javier in order to get a supply of cocaine started. She denied being part of any conspiracy to distribute cocaine. The money found in the Sunstream townhome was money that her husband had given her when they separated. The pay-owe ledgers that had been found were, in part, her drug ledgers from past drug dealing. The writing which indicated “Fabio debo,” represented money owed to her by a previous client, “Fabio Restrepo,” and had nothing to do with Fabio Gil. The rubber bands and scale were hers, but also related to past drug dealing.
 

 Fabio Gil did not testify in his defense. However, a William Hutson did testify on behalf of both Gil and Harvey. He testified he lived at the apartment on Coliseum Street in Los Angeles that Gil, Harvey and Harvey’s mother visited in the first part of December 1988. Harvey and Hutson’s daughter, Caroline Safford, were good friends and the purpose of the visit was for Harvey to introduce her mother to Caroline. However, Caroline was not home, so Hutson talked with Harvey for a short time and then Harvey and the others left. Harvey was the only one in the group who could speak English.
 

 Fabio Gil’s mother, Maria Pearce, testified her son moved in with Catalina Harvey on December 1, 1988. Fabio Gil moved his and Harvey’s belongings to their new residence on that date.
 

 II
 

 Pay-owe Ledgers Admissible as Nonhearsay
 

 All three defendants contend the trial court erred in admitting evidence of the pay-owe ledgers. Defendants contend the use of these
 
 *680
 
 ledgers constituted improper hearsay evidence
 
 [3]
 
 and violated the confrontation clause of both the state and federal Constitutions.
 

 Prior to trial, defendants made an
 
 in limine
 
 motion regarding the introduction and use of the pay-owe ledgers found in the residences in Costa Mesa, El Toro and Irvine. The court determined it would defer ruling on these issues until the close of the prosecution’s case, since this was not a jury trial. Thereafter, the various ledgers were introduced and Agent Cid testified as to their meaning. The court indicated it would not receive evidence of the ledgers for the truth of the matters asserted, but instead as circumstantial evidence of cocaine sales and a conspiracy. The court indicated narcotics dealers tend to keep records of their dealing; here, the presence of the records was circumstantial evidence that cocaine sales were taking place.
 

 Though Agent Cid’s testimony
 
 seemed
 
 to make use of the ledgers in a hearsay fashion, hearsay is a two-pronged inquiry. In order to constitute hearsay, a statement must be received as proof of the truth of the matter stated. If the statement is received as proof of something other than the truth of the statement itself, it is not hearsay, Thus, the critical inquiry is whether the testimony was
 
 received
 
 to show these transactions actually occurred as stated. If the testimony was received to prove these transactions occurred in the manner stated, it was hearsay. However, if the testimony was received, as the court indicated, as circumstantial evidence of sales of cocaine or a conspiracy to sell or distribute cocaine, it was not hearsay.
 
 (United States
 
 v.
 
 Wilson
 
 (8th Cir. 1976) 532 F.2d 641, 645-646; see also 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 575, pp. 550-551.)
 

 A ledger was found at the Wilson Street address in Costa Mesa which contained various cocaine markers in the left hand margin. The ledger had in its left column “Y7X8,” “Levis,” and “Pio.” On the right hand side of the column were numerical amounts which corresponded to each of these markers. Agent Cid was allowed to testify that he believed the numerical amounts, when added up, indicated the total amount of kilos of cocaine once present at the house. This total was 595. Since only 92 kilos of cocaine were seized, this would indicate the vast majority of cocaine had already been sold.
 

 Papers containing various numerical notations were found at the Sun-stream address in Irvine where defendants Harvey and Gil lived. These
 
 *681
 
 papers were found in proximity to Harvey’s purse and Gil’s wallet. Later, in her testimony, Harvey indicated she had written portions of these particular documents. She also told Agent Cid during the search that the items were hers.
 

 Cid testified the papers were, in part, pay-owe ledgers documenting sales of kilogram quantities of cocaine. Cid testified the numerical amounts constituted moneys paid to cocaine dealers for kilogram purchases made by buyers. Those amounts indicated 10 kilos were sold for $12,500 each for a total purchase price of $125,000. A portion of the purchase price was still owed.
 

 An entry on one of the pay-owe ledgers contained the notation “Fabio debo,” followed by a series of numbers. Cid testified this reflected a drug debt either owed by or to someone named “Fabio.”
 

 Papers containing numerical notations were also found at the Eaglemont address in El Toro where defendant Gilberto Villada resided. Some of the numerical amounts corresponded with amounts of cash found at the location. Agent Cid opined that these papers were also pay-owe ledgers. A notation of “debe Carlos,” followed by the number 3508 was interpreted by Cid as a drug debt of $3,508 which was owed by or to someone named “Carlos.”
 

 While these examples are just some of the many instances of interpretation rendered in the several volumes of testimony given by Agent Cid, they are nonetheless illustrative. In the instance just cited, Agent Cid gave specific testimony regarding what he thought the ledgers stated or meant. Defendants argue this is inadmissible hearsay, as it does not fall within any recognized exception to the hearsay rule. The prosecutor in the trial court argued it was nonhearsay and asked it be admitted for a nonhearsay purpose. No “business records” exception was ever stated nor proven, and die court specifically held that, based upon a lack of proof as to the identity of the person or persons who made the writings, they were not exceptions to the hearsay rule as “admissions” or “co-conspirator” statements.
 

 However, the transcript is replete with instances where the court indicated it would not receive this evidence for the truth of the matters asserted, but instead as circumstantial evidence of cocaine sales and a possible conspiracy involving cocaine sales. At the conclusion of the People’s case, defense counsel again argued that Agent Cid’s testimony regarding the ledgers should be stricken. The court replied: “I don’t think the documents are admissions or statements in furtherance of a conspiracy because we don’t know who the declarant is. And I don’t want to get into a circular analysis on
 
 *682
 
 whether the chicken or the egg came first, but I don’t think you necessarily have to prove the conspiracy before you admit evidence. I don’t think that these documents prove a conspiracy. They may, when taken with the totality of the rest of the evidence, assist the court in reaching a conclusion that there was a conspiracy. . . . Mr. Dudley, your argument essentially was they are being offered for the truth of the matter, [f] There is an entry on 1-B, which that entry debe, d-e-b-e, Carlos, if tills document were being offered to substantiate the fact that there was a transfer of cocaine or money on a particular day to an individual named Carlos, then I think it is offered for the truth. But it is not, and I wouldn’t consider it for that purpose. ... I don’t think it establishes a conspiracy in and of itself. But I do think that it is circumstantial evidence [of] sales of cocaine and perhaps there was a conspiracy because people engaged in the sale of cocaine tend to keep records of money or cocaine. So I think that it is circumstantial evidence of sales and perhaps a conspiracy.” To this, the prosecutor responded: “Again, non-hearsay.” The court then stated “Non-hearsay. I don’t see any viable hearsay theory for these documents to come in for the truth.”
 

 Because of a surprising lack of California cases on point, we look to federal precedent to determine the admissibility of pay-owe ledgers for a nonhearsay purpose. In
 
 United States
 
 v.
 
 Wilson, supra,
 
 532 F.2d 641, defendants were convicted of conspiracy to distribute heroin. At trial, an informant testified defendants used various residences from which heroin was sold. Notebooks seized from one of these residences were admitted, along with their written contents. A police officer was allowed to read the contents of the notebooks in their entirety to the jury. Two of the defendants were specifically identified in the notebooks as taking drugs and money. The third defendant was not mentioned. The declarant who had authored the notebooks was unknown. The court upheld the introduction of the notebooks and their contents under a nonhearsay theory, as circumstantial evidence that the residence was the scene of drug sales and drug-related activity. Also, the existence of the notebooks and the fact the written entries in them corroborated the testimony of the informant as to the manner in which defendants carried out their business was a further basis for their admission.
 
 (Id.
 
 at pp. 645-646.) In
 
 Wilson,
 
 the ledgers and their contents were admitted, and the contents were read to the trier of fact. The contents, taken at face value, asserted that two of the defendants were involved in heroin sales. The court nonetheless upheld the admission of the ledgers and their contents for a nonhearsay purpose. We find
 
 Wilson
 
 to be persuasive in the case at bench.
 

 We thus conclude the ledgers and the testimony regarding them were admitted for a nonhearsay purpose and need not have met any of the criteria
 
 *683
 
 of a recognized hearsay exception. As the relevance of the purpose for which they were admitted is indisputable, we must next address whether or not, even in light of a seemingly valid nonhearsay purpose, the admission of testimony regarding the ledgers and the ledgers themselves violated defendants’ rights under the confrontation clause of the United States and California Constitutions.
 

 Defendants rely heavily on the case of
 
 United States
 
 v.
 
 Ordonez
 
 (9th Cir. 1984) 737 F.2d 793 for the proposition that the use of the ledgers here violated the confrontation clause. In
 
 Ordonez,
 
 ledgers were introduced which indicated extensive narcotics transactions, and an expert testified as to the meaning of the ledgers. Defendant’s conviction was reversed, based in part upon the court’s ruling that the evidence regarding these ledgers violated the confrontation clause.
 
 Ordonez
 
 is factually and legally distinct from the case at bench. First of all, in
 
 Ordonez,
 
 the ledgers were the
 
 only
 
 evidence offered as to the two drug transactions they purportedly described. No other evidence as to the two transactions accounted for in these ledgers was offered by the prosecution. In contrast, here, the ledgers comprised only a portion of a 15-volume transcript. The ledgers took up less than one volume even as the prosecution’s case took up the majority of the trial transcript. Eighty-one prosecution exhibits were received in evidence.
 

 In addition, in
 
 Ordonez,
 
 the government never offered the ledgers as circumstantial evidence and for a nonhearsay purpose, though they were offered and accepted on a coconspirator theory. No
 
 in limine
 
 instructions were ever given to the jury. The court held the confrontation clause was violated irrespective of whether or not the ledgers properly came in under the coconspirator exception. The court held that, because the government could not prove unavailability and could not show the declarants who actually made the ledgers were not identifiable, the confrontation clause was violated. (737 F.2d at pp. 802-804.)
 
 [4]
 

 
 *684
 

 Ordonez
 
 deals with hearsay and coconspirator statements, whereas here, as in
 
 United States
 
 v.
 
 Wilson, supra,
 
 532 F.2d 641, the evidence was received as circumstantial evidence and for a nonhearsay purpose. In a recent case the Ninth Circuit Court of Appeals upheld the admission of pay-owe ledgers for a
 
 nonhearsay
 
 purpose as circumstantial evidence of drug-related activity. Citing
 
 Wilson
 
 with approval, the court distinguished
 
 United States
 
 v.
 
 Ordonez, supra,
 
 737 F.2d 793, stating it “. . . holds that the rule against hearsay prohibits the admission of drug ledgers and pay/owe sheets to prove the truth of the matters asserted in them unless a proper foundation has been laid.
 
 Ordonez
 
 does not prohibit the use of documents for all purposes. Most relevant ... is our statement in
 
 Ordonez
 
 that the rule against hearsay does not stand as a bar to the admission of ledgers as ‘circumstantial evidence “to show the character and use of the place where the [ledgers] were found . . . .” ’ ”
 
 (United States
 
 v.
 
 Jaramillo-Suarez
 
 (9th Cir. Aug. 23, 1991) 950 F.2d 1378, 1383 [Dock. No. 89-50313], quoting
 
 United States
 
 v.
 
 Ordonez, supra,
 
 at p. 799, and
 
 United States
 
 v.
 
 Wilson, supra,
 
 at p. 645, fn. omitted.) To the extent that
 
 Ordonez
 
 remains viable, it is inapposite to the applicable facts and law here.
 

 As for defendant’s argument the confrontation clause was violated by the admission of the ledgers here, the confrontation clause cannot be violated when evidence is received for a nonhearsay purpose.
 
 (Tennessee
 
 v.
 
 Street
 
 (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 430-431, 105 S.Ct. 2078].) “No Confrontation Clause issue is raised where . . . statements are not offered for the truth of the matter asserted. [Citation.]”
 
 (U.S.
 
 v.
 
 Lujan, supra,
 
 936 F.2d at p. 410, citing
 
 U.S.
 
 v.
 
 Kirk
 
 (9th Cir. 1988) 844 F.2d 660, 663; see also
 
 United States
 
 v.
 
 Miller
 
 (9th Cir. 1985) 771 F.2d 1219, 1233.) While we recognize our authority to interpret the confrontation clause provision of our state Constitution differently than its federal counterpart (Cal. Const., art. I, § 24), we find nothing in the language or history of the state provision which warrants a different interpretation. Defendants also rely on
 
 People
 
 v.
 
 Coble
 
 (1976) 65 Cal.App.3d 187 [135 Cal.Rptr. 199]. There, a tape recording was admitted in defendant’s murder trial wherein the declarant, a possible accomplice, made statements which were partially inculpatory of himself and highly inculpatory of defendant. Declarant did not testify. The court noted the portion of the statement which was not against declarant’s penal interest, and thus not admissible, was the portion which inculpated defendant. The portion of declarant’s statement that was against his penal interest was wholly irrelevant to the issues at trial. The court determined the evidence was improperly admitted as a declaration against interest. Noting that the declarant was not cross-examined and was
 
 *685
 
 not found unavailable, the court determined the confrontation clause had been violated.
 

 Of course, a declaration against interest, as codified in Evidence Code section 1230,
 
 requires
 
 that declarant be unavailable as a predicate to admissibility. Furthermore, in
 
 Coble,
 
 the portion of the statement which inculpated defendant, and was therefore relevant, was not against declarant’s interest. The basis for the admissibility of the tape recording in
 
 Coble
 
 was as a declaration against interest under section 1230, a hearsay exception. Yet the foundation required to admit the tape recording under section 1230 was sorely lacking. Defendant’s reliance on
 
 Coble
 
 here is misplaced. It is thoroughly inapposite on its facts to the case at bench.
 

 Defendants also rely on
 
 United States
 
 v.
 
 Mouzin
 
 (9th Cir. 1986) 785 F.2d 682. In
 
 Mouzin,
 
 the court held that various ledgers which were introduced in a narcotics case were erroneously admitted under the coconspirator exception to the hearsay rule. The court held an inadequate foundation had been laid for their admission. The court also refused to address the issue of a nonhearsay use for the ledgers, since this was never addressed in the lower court.
 
 Mouzin
 
 is thus distinguishable as it did not address the issue of a nonhearsay use of the ledgers.
 

 Finally, defendant Gil, by letter, directs us to the recent case of
 
 In re Nathaniel C.
 
 (1991) 228 Cal.App.3d 990 [279 Cal.Rptr. 236], In
 
 Nathaniel C.,
 
 the court found insufficient evidence of a predicate offense required to be proven in order to show criminal street gang involvement pursuant to Penal Code section 186.22, and reversed a finding on the enhancement. The only proof of the predicate offense was the hearsay testimony of a police officer that one of defendant’s fellow gang members had shot another. This was hearsay because the officer indicated he had no personal knowledge of the shooting but had been told about it by officers from a different jurisdiction. The predicate offense was an element of the enhancement and had to be proven by competent evidence. The officer’s testimony he had been told about it by others was hearsay, as what he had been told was offered to prove the shooting actually occurred as asserted. This obvious hearsay situation is inapposite to the facts here.
 

 Respondent cites by analogy “bookmaking cases” wherein courts have given their imprimatur to the admissibility of seized ledgers offered to circumstantially prove that bookmaking was occurring. (See, e.g.,
 
 People
 
 v.
 
 Cohen
 
 (1951) 107 Cal.App.2d 334, 344-345 [237 P.2d 301];
 
 People
 
 v.
 
 Levene
 
 (1951) 107 Cal.App.2d 125, 128 [236 P.2d 604].) We find this analogy to be apposite and again note that, even though these cases do not address the confrontation clause issue which defendant raises, nonhearsay
 
 *686
 
 cannot give rise to a confrontation clause violation.
 
 (Tennessee
 
 v.
 
 Street, supra,
 
 471 U.S. at p. 414 [85 L.Ed.2d at pp. 430-431].)
 

 Accordingly, we find there was no violation of the confrontation clause under the federal or state Constitutions in the nonhearsay use of the ledgers as circumstantial evidence of cocaine sales and a cocaine conspiracy, and the ledgers were properly admitted.
 

 Ill
 

 Expert Opinion Testimony
 

 Defendants next contend the trial court erroneously admitted the testimony of Agent Cid regarding the nature of various transactions that he and other officers observed, as well as the various roles and levels of culpability manifested by each defendant. The trial court indicated it believed the objections by counsel were properly directed to the weight the testimony should be given and not its admissibility. The testimony was allowed. Agent Cid testified that various activities were either consistent with or indicative of narcotics trafficking. Most of the questioning was in the form of hypotheticals, with Cid being asked to assume various facts that had been adduced at trial and to then state a conclusion based upon those facts.
 

 Cid testified the trip Gilberto Villada made to Mariposa Street in Los Angeles with the blue bag was consistent with the activity of a person involved in a Colombian cocaine distribution cell. He came to this conclusion based upon not just the trip itself, but all the surrounding and attendant facts relating to the activities of Gilberto Villada and his codefendants. He testified the meeting between Javier Villada and defendants Harvey and Gil on November 21 was a cocaine trafficking meeting. This determination was also arrived at based upon all the attendant circumstances relating to the activities of both Harvey and Gil up to that time. He testified the December 2 meeting between Gil and Gilberto Villada was consistent with a Colombian cocaine transaction. Cid also testified the December 5 meeting between Gilberto Villada and Eduardo Ortiz involved a transfer of proceeds from cocaine sales. Finally, he testified as to where he believed each defendant fell within the hierarchy of the Colombian cocaine distribution cell.
 

 The evidence with respect to Agent Cid’s expertise was uncontroverted and defendants do not contend he lacked expertise in the area of Colombian cocaine trafficking. Therefore we do not address his qualifications, but rather the subject of his expert opinion.
 

 “A witness is qualified to testify about a matter calling for an expert opinion if his peculiar skill, training, or experience enable him to form an
 
 *687
 
 opinion that will be useful to the jury.”
 
 (People
 
 v.
 
 Davis
 
 (1965) 62 Cal.2d 791, 800 [44 Cal.Rptr. 454, 402 P.2d 142].) The question becomes whether the expert opinion given was helpful to the trier of fact. The reception of expert opinion testimony is within the sound discretion of the trial court.
 
 (People
 
 v.
 
 Haeussler
 
 (1953) 41 Cal.2d 252, 261 [260 P.2d 8], overruled on other grounds in
 
 People
 
 v.
 
 Cahan
 
 (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) Even though facts may be within the knowledge or understanding of the trier of fact, the conclusions to be drawn therefrom may require expert testimony.
 
 (Wells Truckways
 
 v.
 
 Cebrian
 
 (1954) 122 Cal.App.2d 666, 677 [265 P.2d 557]; 1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, § 474, pp. 445-446.) “The decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.”
 
 (People
 
 v.
 
 Cole
 
 (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435].) An expert’s opinion is admissible when “[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.” (Evid. Code, § 801, subd. (a).)
 

 Defendants concede such expert testimony has been accepted under federal law. (See
 
 United States
 
 v.
 
 Kinsey
 
 (9th Cir. 1988) 843 F.2d 383, 387-389.) However, defendants point out that
 
 Kinsey
 
 and other cases do not allow testimony in the nature of a direct opinion as to defendant’s guilt or innocence.
 
 (Id.
 
 at p. 388.) Agent Cid did not directly opine that defendants were guilty, though he did testify as to various “ultimate issues.” An expert is not precluded, however, under the law from testifying as to the ultimate issue in the case. (Ibid.) Though the “ultimate issue” rule was once the law in this state and others, it is an archaic concept and is no longer a proper basis for excluding expert testimony. Evidence Code section 805 codifies the modern view, and states that, “Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.” “We believe, . . . that there is no hard and fast rule that experts may not be asked questions that coincide with the ultimate issue in the case, and that the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large measure of discretion involved. We believe further that the modern tendency is against making a distinction between evidentiary and ultimate facts as subjects of expert opinion.”
 
 (People
 
 v.
 
 King
 
 (1951) 104 Cal.App.2d 298, 304 [231 P.2d 156].)
 

 Defendant bears the burden of showing the trial court abused its discretion in allowing this evidence. Such an abuse of discretion must be
 
 *688
 
 affirmatively demonstrated and will require reversal only when it clearly appears that a prejudicial abuse of discretion has occurred.
 
 (Mission Imports, Inc.
 
 v.
 
 Superior Court
 
 (1982) 31 Cal.3d 921, 932 [184 Cal.Rptr. 296, 647 P.2d 1075].) The California cases cited by defendant for the proposition that Agent Cid’s testimony was erroneously received are inapposite or unpersuasive. In
 
 Westbrooks
 
 v.
 
 California
 
 (1985) 173 Cal.App.3d 1203 [219 Cal.Rptr. 674] the court held it was error for the trial court to admit the testimony of an expert that an accident scene was not a dangerous condition, as the jury was well able to determine for themselves whether the condition was dangerous or not, without resorting to any expert testimony. The basis for the reversal was the court’s determination that the facts presented were well within the common experience of lay jurors.
 
 (Id.
 
 at pp. 1209-1210.)
 

 In
 
 People
 
 v.
 
 Bledsoe
 
 (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] our Supreme Court reversed defendant’s rape conviction based on expert testimony regarding “rape-trauma syndrome.” The court held this syndrome was a therapeutic device designed to identify and treat the victims of rape, and was of no assistance to the trier of fact in determining whether or not a rape had actually occurred.
 
 (Id.
 
 at pp. 247-251.)
 

 In
 
 People
 
 v.
 
 Hernandez
 
 (1977) 70 Cal.App.3d 271 [138 Cal.Rptr. 675] the court found an abuse of discretion by the trial court in admitting testimony regarding a police officer’s opinion that defendant’s shaking his head from side to side meant that he had been asked if he had any more narcotics and had responded that he did not.
 
 (Id.
 
 at pp. 274-275.) The court held the officer’s expertise did not add any probative value to the evidence, which the jury was quite capable of analyzing for itself.
 
 (Ibid.)
 

 A wealth of California cases, however, allow expert testimony in the field of narcotics. (See
 
 People
 
 v.
 
 Williams
 
 (1988) 44 Cal.3d 883 [245 Cal.Rptr. 336, 751 P.2d 395] [police officer can testify defendant was under the influence of narcotics];
 
 People
 
 v.
 
 Nunn
 
 (1956) 46 Cal.2d 460 [296 P.2d 813] [police officer allowed to testify most addiction results from criminal association rather than pain medication];
 
 People
 
 v.
 
 Douglas
 
 (1987) 193 Cal.App.3d 1691 [239 Cal.Rptr. 252] [police officer allowed to testify that a long hypothetical indicated that marijuana was possessed for sale];
 
 People
 
 v.
 
 Arguello
 
 (1966) 244 Cal.App.2d 413 [53 Cal.Rptr. 245] [police officer allowed to testify pills were narcotics that were possessed for sale].) Though defendants contend the testimony here went beyond a mere recitation that narcotics were possessed for sale, which is of course true, we nonetheless believe the subject matter was sufficiently beyond the common expertise of the trier of fact to render expert testimony not only helpful but necessary for an understanding of the meaning and import of various actions. Accordingly,
 
 *689
 
 we find no error in the trial court’s admission of Agent Cid’s expert testimony regarding the significance of various activities and the role of each defendant in the hierarchy of a Colombian cocaine distribution cell.
 

 IV, V
 
 *
 

 VI
 

 The Imposition of Defendant Villada’s 15-year Enhancement
 

 Defendant Gilberto Villada contends the court erred in ruling it had no authority or discretion to impose a sentencing enhancement of less than 15 years under Health and Safety Code section 11370.4. Health and Safety Code section 11370.4, subdivision (a)(4) states that, “Any person convicted of a violation of, or a conspiracy to violate, Section 11351, 11351.5, or 11352 with respect to a substance containing heroin, cocaine base as specified in paragraph (1) of subdivision (f) of Section 11054, or cocaine as specified in paragraph (6) of subdivision (b) of Section 11055 shall receive an additional term as follows. . . [¶] Where the substance exceeds 100 pounds by weight, the person shall receive an additional term of 15 years.”
 

 Subdivision (e) of Health and Safety Code section 11370.4 states that, “Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in this section if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment.”
 

 Health and Safety Code section 11370.4, subdivision (a) makes it clear the court
 
 shall
 
 impose the additional term of 15 years if the allegation is proven. Subdivision (e) is the escape clause and indicates the court may strike the enhancement if it determines there are circumstances in mitigation. The wording of the section makes it clear that the sentencing court has only two alternatives. If the court does not feel there are mitigating circumstances sufficient to justify the striking of the enhancement, it must impose the enhancement. Otherwise, if it finds that mitigating circumstances do exist which would justify striking the enhancement, it may be stricken. Nowhere does the section indicate the court may impose only a portion of the enhancement. In interpreting the statute, the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.
 
 (Great Lakes Properties, Inc.
 
 v.
 
 City of El Segundo
 
 (1977) 19 Cal.3d 152, 155
 
 *690
 
 [137 Cal.Rptr. 154, 561 P.2d 244].) Nowhere in the statute does it indicate the court has any discretion besides either imposing the full enhancement or striking it in its entirety.
 

 Gilberto Villada’s appellate counsel urges us by letter to interpret the escape clause found in Health and Safety Code section 11370.4, subdivision (e) as vesting the trial court with the discretion to impose a sentence for a
 
 lesser enhancement,
 
 such as that for a 3-, 10- or 25-pound quantity as provided for in subdivisions (a)(1), (a)(2), or (a)(3) of section 11370.4. Counsel urges the failure of the Legislature to explicitly vest such discretion with the trial court may be a “draftsman’s oversight,” as described in
 
 People
 
 v.
 
 Pieters
 
 (1991) 52 Cal.3d 894 [276 Cal.Rptr. 918, 802 P.2d 420],
 
 Pieters
 
 held the quantity enhancements found in Health and Safety Code section 11370.4 were impliedly excepted from the double-the-base term limit of former Penal Code section 1170.1, subdivision (g).
 
 (Id.
 
 at pp. 899-902, 904.) The court reasoned that the stated legislative intent of enhancing the punishment of persons dealing in large quantities of narcotics would be frustrated if the aforementioned quantity enhancements were not excepted from a double-the-base term limitation.
 
 (Id.
 
 at p. 901.)
 

 Pieters
 
 is of no assistance to Gilberto Villada. The trial court’s limited discretion to either impose the weight enhancement in full or to strike it does not in any way frustrate the stated legislative intent to enhance the punishment of persons dealing in large quantities of narcotics. In fact, the limitation on the trial court’s discretion in this regard is in accordance with and furthers this legislative intent, though it may understandably frustrate trial judges whose discretion is reduced.
 

 In
 
 People
 
 v.
 
 Cattaneo
 
 (1990) 217 Cal.App.3d 1577 [266 Cal.Rptr. 710] the court indicated, with respect to a five-year enhancement imposed under Health and Safety Code section 11370.4, subdivision (a)(2) for sales of cocaine exceeding 10 pounds in weight, that . . the trial court was required to impose the additional term unless it chose to strike the enhancement.” (I
 
 d.
 
 at p. 1589.)
 

 Defendant cites Penal Code section 1181 for the proposition the court had the discretion to impose only a portion of the enhancement. Penal Code section 1181, subdivision 7 states that, “When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or
 
 *691
 
 ordering a new trial, and this power shall extend to any court to which the case may be appealed.”
 

 Enhancements do not define a crime but merely impose an additional punishment to that which accompanies the criminal offense itself.
 
 (People
 
 v.
 
 Best
 
 (1983) 143 Cal.App.3d 232, 236 [191 Cal.Rptr. 614].) An enhancement is not a sentencing choice.
 
 (People
 
 v.
 
 Bejarano
 
 (1981) 114 Cal.App.3d 693, 706 [173 Cal.Rptr. 71].) Unless a statute says otherwise, an enhancement may be imposed or stricken, but this is the extent of the trial court’s discretion.
 
 (See People
 
 v. Eberhardt (1986) 186 Cal.App.3d 1112, 1122-1124 [231 Cal.Rptr. 387].) Imposition of sentence on an enhancement may not be stayed; to do so is an illegal sentence.
 
 (Id.
 
 at p. 1121.)
 

 We find nothing in the language of Penal Code section 1181, subdivision 7 which would indicate the court’s authority to impose a lesser degree of a crime has any import with respect to a sentencing enhancement. Accordingly, we find that the trial court’s only real choice in the case at bench was to impose the enhancement in full or to strike it, and the court acted properly in imposing the full 15-year enhancement.
 

 VII, VIII
 
 *
 

 Disposition
 

 Defendant Gil’s three-year sentence for possessing cocaine for sale is ordered stayed. The superior court clerk is directed to prepare an abstract of judgment accordingly and transmit it to the Department of Corrections and other appropriate agencies. In all other respects, the judgments are affirmed.
 

 Sonenshine, Acting P. J„ and Wallin, J„ concurred.
 

 Appellants’ petitions for review by the Supreme Court were denied November 26, 1991.
 

 [1]
 

 Agent Wilfredo Cid, the prosecution’s expert witness in this case, testified that markers such as “Levi” are put on the cocaine to identify it and to set it apart from different batches of cocaine.
 

 [2]
 

 Defense testimony indicated Javier Villada left the Eaglemont residence on Thanksgiving Day and did not return. Agent Cid testified that, in Colombian drug trafficking cells, it is common for individuals within those cells to change roles and geographic locations, moving, for instance, from a cell in Los Angeles to a cell in Miami or New York. Cid opined, though he could not be certain, that Javier Villada had been moved to a new location and Gilberto Villada had taken his place.
 

 [3]
 

 Evidence Code section 1200, subdivision (a) states that “ ‘hearsay evidence’ is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.”
 

 [4]
 

 In
 
 Ordonez,
 
 the government argued the ledgers were admissible under rule 801 (d)(2)(E) of the Federal Rules of Evidence. This rule codifies the law of coconspirator statements under federal law. Unlike California law, however, which characterizes coconspirator statements as hearsay
 
 exceptions
 
 (Evid. Code, § 1223), federal law characterizes coconspirator statements as hearsay exclusions. Coconspirator statements are thus treated as if they were not hearsay at all, rather than characterizing them as hearsay and then excepting them from the general rule that hearsay is inadmissible. (See Fed. Rules Evid., rule 801.) This somewhat esoteric distinction has little practical import, however.
 

 In
 
 Bourjaily
 
 v.
 
 United States
 
 (1987) 483 U.S. 171 [97 L.Ed.2d 144, 107 S.Ct. 2775] the United States Supreme Court held, in what can only be described as a partial disapproval of
 
 Ordonez,
 
 that the federal coconspirator rule does not raise any confrontation clause issues.
 
 (Id.
 
 at pp. 183-184 [97 L.Ed.2d at pp. 157-158]; see also
 
 U.S.
 
 v.
 
 Lujan
 
 (9th Cir. 1991) 936 F.2d 406, 410.) In another case which also must be read as disapproving of
 
 Ordonez
 
 in part, the
 
 *684
 
 Supreme Court has held that a showing of unavailability is not required by the confrontation clause as a predicate to the admissibility of coconspirator statements.
 
 {United. States
 
 v.
 
 Inadi
 
 (1986) 475 U.S. 387, 394, 399-400 [89 L.Ed.2d 390, 401-402, 106 S.Ct. 1121].)
 

 *
 

 See footnote,
 
 ante,
 
 page 1206.
 

 *
 

 See footnote, ante, page 1206.